CAVANAGH, J.
The issue in this case is the proper interpretation of the “serious impairment of body function” threshold for non-economic tort liability under MCL 500.3135. We hold that Kreiner v Fischer, 471 Mich 109; 683 NW2d 611 (2004), was wrongly decided because it departed from the plain language of MCL 500.3135, and is therefore overruled. We further hold that, in this case, as a matter of law, plaintiff suffered a serious impairment of a body function. Accordingly, we reverse and remand the case to the trial court for proceedings consistent with this opinion.
I. FACTS AND PROCEEDINGS
This case arises out of an injury that plaintiff, Rodney McCormick, suffered while working as a medium-duty truck loader at a General Motors Corporation *185 (GM) plant.[1] Plaintiff s job mainly consisted of assisting in the loading of trucks, which required climbing up and around trucks and trailers, standing, walking, and heavy lifting. He generally worked 9- to 10-hour shifts, 6 days a week.
On January 17, 2005, a coworker backed a truck into plaintiff, knocking him over, and then drove over plaintiffs left ankle. Plaintiff was immediately taken to the hospital, and x-rays showed a fracture of his left medial malleolus.[2] Plaintiff was released from the hospital that day, and two days later metal hardware was surgically inserted into his ankle to stabilize plaintiffs bone fragments. Plaintiff was restricted from weight-bearing activities for one month after the surgery and then underwent multiple months of physical therapy. The metal hardware was removed in a second surgery on October 21, 2005.
At defendant’s request, plaintiff underwent a medical evaluation with Dr. Paul Drouillard in November 2005. He indicated that plaintiff could return to work but was restricted from prolonged standing or walking. On January 12, 2006, the specialist who performed plaintiffs surgeries cleared him to return to work without restrictions. The specialist’s report noted that plaintiff had an “excellent range of motion,” and an x-ray showed “solid healing with on [sic] degenerative joint disease of his ankle.”
Beginning on January 16, 2006, plaintiff returned to work as a medium-duty truck loader for several days, *186 but he had difficulty walking, climbing, and crouching because of continuing ankle pain. He requested that his job duties be restricted to driving, but defendant directed him to cease work.
Defendant required plaintiff to undergo a functional capacity evaluation (FCE) in March 2006. The FCE determined that plaintiff was unable to perform the range of tasks his job required, including stooping, crouching, climbing, sustained standing, and heavy lifting. This was due to ankle and shoulder pain,[3] a moderate limp, and difficulty bearing weight on his left ankle. The report stated that plaintiffs range of motion in his left ankle was not within normal limits and that difficulty climbing and lifting weights had been reported and observed.
In May 2006, Dr. Drouillard examined plaintiff again and reported that plaintiff could return to work. Dr. Drouillard’s report stated that plaintiff complained of ankle and foot pain, but the doctor found “no objective abnormality to correspond with his subjective complaints.” In June 2006, plaintiff also underwent a magnetic resonance imaging (MRI) test, which showed some postoperative scar and degenerative tissue formation around his left ankle. At plaintiffs request, another FCE was performed on August 1, 2006, which affirmed that plaintiff could return to work without restriction and was capable of performing the tasks required for his job. The report stated that plaintiff complained of “occasional aching” and tightness in his ankle, but it did not appear to be aggravated by activities such as prolonged standing or walking. It also noted that plaintiffs range of motion in his left ankle was still not within normal limits, although it had improved since the March 2006 FCE.
*187 Plaintiff returned to work on August 16, 2006, 19 months after he suffered his injury. He volunteered to be assigned to a different job, and his pay was not reduced. He has been able to perform his new job since that time.
On March 24,2006, plaintiff filed suit, seeking recovery for his injuries under MCL 500.3135. In his October 2006 deposition, plaintiff testified that at the time of the incident, he was a 49-year-old man and his normal life before the incident mostly consisted of working 60 hours a week as a medium-duty truck loader. He stated that he also was a “weekend golfer” and frequently fished in the spring and summer from a boat that he owns. He testified that he was fishing at pre-incident levels by the spring and summer of2006, but he has only golfed once since he returned to work.[4] He stated that he can drive and take care of his personal needs without assistance and that his relationship with his wife has not been affected. He stated that he has not sought medical treatment for his ankle since January 2006, when he was approved to return to work without restriction. He further testified that his life is “painful, but normal,” although it is “limited,” and he continues to experience ankle pain.
*188 The trial court granted defendant’s motion for summary disposition on the basis that plaintiff had recovered relatively well and could not meet the serious impairment threshold provided in MCL 500.3135(1). The Court of Appeals affirmed, with one judge dissenting. McCormick v Carrier, unpublished opinion per curiam of the Court of Appeals, issued March 25, 2008 (Docket No. 275888). The majority held that, under Kreiner, plaintiffs impairment did not affect his ability to lead his normal life because he is able to care for himself, fish and golf, and work at the same rate of pay. The dissent disagreed, arguing that two doctors had determined that the impairment would cause problems over plaintiffs entire life and his employer had determined that he could not perform his work duties, the main part of his “normal” life.
After initially denying leave to appeal, this Court granted plaintiffs motion for reconsideration, vacated its prior order, and granted the application for leave to appeal. McCormick v Carrier, 485 Mich 851 (2009).
II. STANDARD OF REVIEW
This Court reviews a motion for summary disposition de novo. In re Egbert R Smith Trust, 480 Mich 19, 23-24; 745 NW2d 754 (2008). The proper interpretation of a statute is a legal question that this Court also reviews de novo. Herman v Berrien Co, 481 Mich 352, 358; 750 NW2d 570 (2008).
III. ANALYSIS
The issue presented in this case is the proper interpretation of MCL 500.3135. We hold that Kreiner incorrectly interpreted MCL 500.3135 and is overruled because it is inconsistent with the statute’s plain language *189 and this opinion. Further, under the proper interpretation of the statute, plaintiff has demonstrated that, as a matter of law, he suffered a serious impairment of body function.
A. OVERVIEW OF MCL 500.3135
In 1973, the Michigan Legislature adopted the no-fault insurance act, MCL 500.3101 et seq. The act created a compulsory motor vehicle insurance program under which insureds may recover directly from their insurers, without regard to fault, for qualifying economic losses arising from motor vehicle incidents. See MCL 500.3101 and 500.3105. In exchange for ensuring certain and prompt recovery for economic loss, the act also limited tort liability. MCL 500.3135. See also DiFranco v Pickard, 427 Mich 32, 40-41; 398 NW2d 896 (1986). The act was designed to remedy problems with the traditional tort system as it relates to automobile accidents. These included that “[the contributory negligence liability scheme] denied benefits to a high percentage of motor vehicle accident victims, minor injuries were overcompensated, serious injuries were undercompensated, long payment delays were commonplace, the court system was overburdened, and those with low income and little education suffered discrimination.” Shavers v Attorney General, 402 Mich 554, 579; 267 NW2d 72 (1978).
Under the act, tort liability for non-economic loss arising out of the ownership, maintenance, or use of a qualifying motor vehicle is limited to a list of enumerated circumstances. MCL 500.3135(3). The act creates threshold requirements in MCL 500.3135(1), which has remained unchanged in all key aspects since the act was adopted. That subsection currently provides that “[a] person remains subject to tort liability for noneconomic *190 loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement.”
The threshold requirement at issue in this case is whether plaintiff has suffered “serious impairment of body function.” The act did not originally define this phrase. Accordingly, it initially fell to this Court to do so, and the result was a series of differing opinions. In Cassidy v McGovern, 415 Mich 483, 502; 330 NW2d 22 (1982), this Court held that whether the serious impairment threshold is met is a question of law for the court to decide where there is no material disputed fact. It further held that in order to meet the threshold, the plaintiff must show an objectively manifested injury and an impairment of an important body function, which it defined as “an objective standard that looks to the effect of an injury on the person’s general ability to live a normal life.” Id. at 505. This Court later in part modified and in part affirmed Cassidy in DiFranco. The DiFranco Court agreed that a plaintiff had to suffer an objectively manifested injury, but it rejected the Cassidy Court’s determination that the impairment needed to be “important” and its definition of “important.” DiFranco, 427 Mich at 61-67, 70-75. The DiFranco Court further held that whether the threshold is met is a question of law for the court only if there are no material disputed facts and the facts could not support conflicting inferences. Id. at 53-54.
In 1995, however, the Legislature intervened. It amended MCL 500.3135 to define a “serious impairment of body function” as “an objectively manifested impairment of an important body function that affects the person’s general ability to lead his or her normal life.” MCL 500.3135(7). The Legislature also expressly *191 provided that whether a serious impairment of body function has occurred is a “question^ of law” for the court to decide unless there is a factual dispute regarding the nature and extent of injury and the dispute is relevant to deciding whether the standard is met. MCL 500.3135(2)(a). Thus, the Legislature incorporated some language from DiFranco and Cassidy but also made some significant changes.[5]
This Court interpreted the amended provisions in 2004, in Kreiner. The question before this Court is whether the Kreiner majority properly interpreted the statute, and, if not, whether its interpretation should be overruled.
B. INTERPRETATION OF MCL 500.3135
The primary goal of statutory construction is to give effect to the Legislature’s intent. Briggs Tax Serv, LLC v Detroit Pub Sch, 485 Mich 69, 76; 780 NW2d 753 (2010). This Court begins by reviewing the language of the statute, and, if the language is clear and unambiguous, it is presumed that the Legislature intended the meaning expressed in the statute. Id. Judicial construction of an unambiguous statute is neither required nor *192 permitted.[6] In re MCI Telecom Complaint, 460 Mich 396, 411; 596 NW2d 164 (1999). When reviewing a statute, all non-technical “words and phrases shall be construed and understood according to the common and approved usage of the language,” MCL 8.3a, and, if a term is not defined in the statute, a court may consult a dictionary to aid it in this goal, Oakland Co Bd of Co Rd Comm’rs v Mich Prop & Cas Guaranty Ass’n, 456 Mich 590, 604; 575 NW2d 751 (1998). A court should consider the plain meaning of a statute’s words and their “ ‘placement and purpose in the statutory scheme.’ ” Sun Valley Foods Co v Ward, 460 Mich 230, 237; 596 NW2d 119 (1999) (citation omitted). “Where the language used has been subject to judicial interpretation, the legislature is presumed to have used particular words in the sense in which they have been interpreted.” People v Powell, 280 Mich 699, 703; 274 NW 372 (1937). See also People v Wright, 432 Mich 84, 92; 437 NW2d 603 (1989).
1. A QUESTION OF LAW OR FACT UNDER MCL 500.3135(2)
The first step in interpreting MCL 500.3135 is to determine the proper role of a court in applying MCL 500.3135(1) and (7). The Legislature addressed this issue in the amended MCL 500.3135(2)(a), which states in relevant part:
The issues of whether an injured person has suffered serious impairment of body function or permanent serious disfigurement are questions of law for the court if the court finds either of the following:
*193 (i) There is no factual dispute concerning the nature and extent of the person’s injuries.
(ii) There is a factual dispute concerning the nature and extent of the person’s injuries, but the dispute is not material to the determination as to whether the person has suffered a serious impairment of body function or permanent serious disfigurement.
Under the plain language of the statute, the threshold question whether the person has suffered a serious impairment of body function should be determined by the court as a matter of law as long as there is no factual dispute regarding “the nature and extent of the person’s injuries” that is material to determining whether the threshold standards are met.[7] If there is a material *194 factual dispute regarding the nature and extent of the person’s injuries, the court should not decide the issue as a matter of law.[8] Notably, the disputed fact does not need to be outcome determinative in order to be material, but it should be “significant or essential to the issue or matter at hand.” Black’s Law Dictionary (8th ed) (defining “material fact”).
2. A “SERIOUS IMPAIRMENT OF BODY FUNCTION” UNDER MCL 500.3135(1) AND (7)
In those cases where the court may decide whether the serious impairment threshold is met as a matter of law, the next issue is the proper interpretation of MCL 500.3135(7). It provides that, for purposes of the section, a “serious impairment of body function” is “an objectively manifested impairment of an important body function that affects the person’s general ability to *195 lead his or her normal life.” On its face, the statutory language provides three prongs that are necessary to establish a “serious impairment of body function”: (1) an objectively manifested impairment (2) of an important body function that (3) affects the person’s general ability to lead his or her normal life.[9]
Overall, because we conclude that each of these prongs’ meaning is clear from the plain and unambiguous statutory language, judicial construction is neither required nor permitted. In re MCI, 460 Mich at 411. Notably, however, a dictionary may aid the Court in giving the words and phrases in MCL 500.3135(7) their common meaning, and where the language used in MCL 500.3135(7) was originally adopted and interpreted in Cassidy and DiFranco, it may be presumed that the Legislature intended the previous judicial interpretation to be relevant. Oakland Co Bd of Rd Comm’rs, 456 Mich at 604; Wright, 432 Mich at 92. As will be discussed within, where the Kreiner majority’s interpretation of these prongs is inconsistent with the clear language of the statute, we hold that Kreiner was wrongly decided. Most significantly, its interpretation of the third prong deviates dramatically from the statute’s text.
a. AN OBJECTIVELY MANIFESTED IMPAIRMENT
Under the first prong, it must be established that the injured person has suffered an objectively manifested impairment of body function. The common meaning of “an objectively manifested impairment” is apparent *196 from the unambiguous statutory language, with aid from a dictionary, and is consistent with the judicial interpretation of “objectively manifested” in Cassidy and DiFranco. To the extent that the Kreiner majority’s interpretation of this prong differs from this approach, it was wrongly decided.
To begin with, the adverb “objectively” is defined as “in an objective manner,” Webster’s Third New International Dictionary (1966), and the adjective “objective” is defined as “1. Of or having to do with a material object as distinguished from a mental concept. 2. Having actual existence or reality. 3. a. Uninfluenced by emotion, surmise, or personal prejudice, b. Based on observable phenomena; presented factually” The American Heritage Dictionary, Second College Edition (1982). It is defined specifically in the medical context as “ [indicating a symptom or condition perceived as a sign of disease by someone other than the person afflicted.” Id.[10] The verb “manifest” is defined as “1. To show or demonstrate plainly; reveal. 2. To be evidence of; prove.” Id. Overall, these definitions suggest that the common meaning of “objectively manifested” in MCL 500.3135(7) is an impairment that is evidenced by actual symptoms or conditions that someone other than the injured person would observe or perceive as impairing a body function. In other words, an “objectively manifested” impairment is commonly understood as one observable or perceivable from actual symptoms or conditions.
*197 Notably, MCL 500.3135(7) does not contain the word “injury,” and, under the plain language of the statute, the proper inquiry is whether the impairment is objectively manifested, not the injury or its symptoms.[11] This distinction is important because “injury” and “impairment” have different meanings. An “injury” is “1. Damage of or to a person.... 2. A wound or other specific damage.” The American Heritage Dictionary, Second College Edition (1982). “Impairment” is the “state of being impaired,” Webster’s Third New International Dictionary (1966), and to be “impaired” means being “weakened, diminished, or damaged” or “functioning poorly or inadequately,” Random House Webster’s Unabridged Dictionary (1998). These definitions show that while an injury is the actual damage or wound, an impairment generally relates to the effect of that damage. Accordingly, when considering an “impairment,” the focus “is not on the injuries themselves, but how the injuries affected a particular body function.” DiFranco, 427 Mich at 67.
Further, the pre-existing judicial interpretation of “objectively manifested” is consistent with the plain language of the later-adopted statute. In Cassidy, this Court explained that the serious impairment threshold was not met by pain and suffering alone, but also required “injuries that affect the functioning of the body,” i.e., “objectively manifested injuries.” Cassidy, 415 Mich at 505. In other words, Cassidy defined *198 “objectively manifested” to mean affecting the functioning of the body.[12] DiFranco affirmed this and further explained that the “objectively manifested” requirement signifies that plaintiffs must “introduce evidence establishing that there is a physical basis for their subjective complaints of pain and suffering” and that showing an impairment generally requires medical testimony. DiFranco, 427 Mich at 74.
The Kreiner majority’s interpretation of this language was only partially consistent with the plain language of the statute. It addressed this issue briefly, stating that “[sjubjective complaints that are not medically documented are insufficient [to establish that an impairment is objectively manifested].” Kreiner, 471 Mich at 132. To the extent that this is inconsistent with DiFranco’s statement that medical testimony will generally be required to establish an impairment, it is at odds with the legislative intent expressed by the adoption of the “objectively manifested” language from DiFranco and Cassidy. Thus, to the extent that Kreiner could be read to always require medical documentation, it goes beyond the legislative intent expressed in the plain statutory text, and was wrongly decided.
b. OF AN IMPORTANT BODY FUNCTION
If there is an objectively manifested impairment of body function, the next question is whether the impaired body function is “important.” The common meaning of this phrase is expressed in the unambiguous statutory language, although reference to a dictionary and limited reference to Cassidy is helpful.
*199 The relevant definition of the adjective “important” is “[m]arked by or having great value, significance, or consequence.” The American Heritage Dictionary, Second College Edition (1982). See also Random House Webster’s Unabridged Dictionary (1998), defining “important” in relevant part as “of much or great significance or consequence,” “mattering much,” or “prominent or large.” Whether a body function has great “value,” “significance,” or “consequence” will vary depending on the person. Therefore, this prong is an inherently subjective inquiry that must be decided on a case-by-case basis, because what may seem to be a trivial body function for most people may be subjectively important to some, depending on the relationship of that function to the person’s life.
The “important body function” language was originally adopted in Cassidy, where the Court stated that an “important” body function is not any body function but also does not refer to the entire body function. Cassidy, 415 Mich at 504. This pre-existing judicial construction of “important body function” is consistent with the common meaning of “important.”[13]
For this prong, the Kreiner majority’s interpretation appears to be consistent with the plain language of the statute, as it only briefly stated that “[i]t is insufficient if the impairment is of an unimportant *200 body function.” Kreiner, 471 Mich at 132.[14] If, however, the Kreiner majority’s position has been construed in a manner that is inconsistent with this opinion, then we disapprove of those constructions.
c. THAT AFFECTS THE PERSON’S GENERAL ABILITY TO LEAD HIS OR HER NORMAL LIFE
Finally, if the injured person has suffered an objectively manifested impairment of body function, and that body function is important to that person, then the court must determine whether the impairment “affects the person’s general ability to lead his or her normal life.” The common meaning of this phrase is expressed by the unambiguous statutory language, and its interpretation is aided by reference to a dictionary, reading the phrase within its statutory context, and limited reference to Cassidy.
To begin with, the verb “affect” is defined as “[t]o have an influence on; bring about a change in.” The American Heritage Dictionary, Second College Edition (1982). An “ability” is “[t]he quality of being able to do something,” id., and “able” is defined as “having sufficient power, skill, or resources to accomplish an object,” Merriam-Webster Online Dictionary <http://www.merriam-webster.com> (accessed May 27, 2010). The adjective “general” means:
1. Relating to, concerned with, or applicable to the whole or every member of a class or category. 2. Affecting or characteristic of the majority of those involved; prevalent: a general discontent. 3. Being usually the case; true or applicable in most instances but not all. 4. a. Not limited in scope, area, or application: .as a general rule. b. Not limited to one class of things: general studies. 5. Involving only the main features of something rather than details or particu *201 lars. 6. Highest or superior in rank. [The American Heritage Dictionary, Second College Edition (1982).]
The sixth definition is obviously irrelevant, and the first definition of “general” does not make sense in this context because a person’s “whole” ability to live his or her normal life is surely not affected short of complete physical and mental incapacitation, which is accounted for in a different statutory threshold: death. The other definitions, however, more or less convey the same meaning: that “general” does not refer to only one specific detail or particular part of a thing, but, at least some parts of it. Thus, these definitions illustrate that to “affect” the person’s “general ability” to lead his or her normal life is to influence some of the person’s power or skill, i.e., the person’s capacity, to lead a normal life.
The next question is the meaning of “to lead his or her normal life.” The verb “lead,” in this context, is best defined as “[t]o pass or go through; live.” The American Heritage Dictionary, Second College Edition (1982). Although the verb “lead” has many definitions, some of which have similar nuances, this definition is the most relevant because it expressly applies in the context of leading a certain type of life. Indeed, other dictionaries provide a similar definition with the same context, using a “type of life” as an example.[15] Similarly, “life” has multiple meanings, but one specifically references the context of leading a particular type of life, which is “[a] manner of living: led a good life.” Id. Other definitions are similar, such as “[t]he physical, mental, *202 and spiritual experiences that constitute a person’s existence,” or “[h]uman existence or activity in general.” Id. Given the contextual examples used in the dictionary, the common understanding of “to lead his or her normal life” is to live, or pass life, in his or her normal manner of living.
Therefore, the plain text of the statute and these definitions demonstrate that the common understanding of to “affect the person’s ability to lead his or her normal life” is to have an influence on some of the person’s capacity to live in his or her normal manner of living. By modifying “normal life” with “his or her,” the Legislature indicated that this requires a subjective, person- and fact-specific inquiry that must be decided on a case-by-case basis. Determining the effect or influence that the impairment has had on a plaintiffs ability to lead a normal life necessarily requires a comparison of the plaintiffs life before and after the incident.
There are several important points to note, however, with regard to this comparison. First, the statute merely requires that a person’s general ability to lead his or her normal life has been affected, not destroyed. Thus, courts should consider not only whether the impairment has led the person to completely cease a pre-incident activity or lifestyle element, but also whether, although a person is able to lead his or her pre-incident normal life, the person’s general ability to do so was nonetheless affected.
Second, and relatedly, “general” modifies “ability,” not “affect” or “normal life.” Thus, the plain language of the statute only requires that some of the person’s ability to live in his or her normal manner of living has been affected, not that some of the person’s normal manner of living has itself been affected. Thus, while the extent to which a person’s general ability to live his *203 or her normal life is affected by an impairment is undoubtedly related to what the person’s normal manner of living is, there is no quantitative minimum as to the percentage of a person’s normal manner of living that must be affected.
Third, and finally, the statute does not create an express temporal requirement as to how long an impairment must last in order to have an effect on “the person’s general ability to live his or her normal life.” To begin with, there is no such requirement in the plain language of the statute. Further, MCL 500.3135(1) provides that the threshold for liability is met “if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement.” While the Legislature required that a “serious disfigurement” be “permanent,” it did not impose the same restriction on a “serious impairment of body function.” Finally, to the extent that this prong’s language reflects a legislative intent to adopt this portion of Cassidy in some measure,[16] Cassidy expressly rejected a requirement of permanency to meet the serious impairment threshold. Cassidy, 415 Mich at 505-506 (noting that “two broken bones, 18 days of hospitalization, 7 months of wearing casts during which dizzy spells further affected his mobility, and at least a minor residual effect one and one-half years later are sufficiently serious to meet the threshold requirement of serious impairment of body function”).
Despite the fact that the language of the statute was plain, the Kreiner majority deviated significantly from *204 the statutory text in its interpretation of this prong. To begin with, the Kreiner majority erred in its interpretation of the phrase “that affects the person’s general ability” for two reasons. First, it selectively quoted only the dictionary definitions of “general” that best supported its conclusions. It gave one definition for this word, “ ‘the whole; the total; that which comprehends or relates to all, or the chief part; a general proposition, fact, principle, etc.; — opposed to particular; that is, opposed to special,’ ” and then relied on definitions of “in general” and “generally” to conclude that “general” means “ ‘for the most part.’ ” Kreiner, 471 Mich at 130, quoting Webster’s New International Dictionary. Webster’s, however, offers 10 definitions of the adjective “general,” many of which are similar to definitions quoted above from The American Heritage Dictionary. Moreover, of these 10 definitions, the majority chose the most restrictive, even though, as discussed above, it does not make the most sense in this context. And, even then, the Kreiner majority looked to other forms of the word. Second, the Kreiner majority stated that “[t]he starting point in analyzing whether an impairment affects a person’s ‘general,’ i.e., overall, ability to lead his normal life should be identifying how his life has been affected, by how much, and for how long.” Kreiner, 471 Mich at 131. Although other portions of the Kreiner majority opinion more carefully stated that the test was the effect on a person’s general ability, this particular reasoning could be pulled out of context to suggest that courts should focus on how much the impairment affects a person’s life, instead of how much it affects the person’s ability to live his or her life.
Further, the Kreiner majority significantly erred in its interpretation of “to lead his or her normal life.” It relied on a dictionary to define “lead” as “to conduct or bring in a particular course.” Notably, depending on *205 how this definition is interpreted, it may have a similar meaning to “live” or “pass” when “conduct” and “course” are given a certain meaning. “Conduct” can mean “to behave or act,” and “course” can mean “[a] mode of action or behavior” or “[a] typical or natural manner of proceeding or developing: customary passage .. . .” The American Heritage Dictionary, Second College Edition (1982). The meaning of “to behave or act in his or her typical or natural manner of proceeding” may be similar to “living in his or her normal manner of living.”
Beyond this point, however, the Kreiner majority went astray and gave the statute a labored interpretation inconsistent with common meanings and common sense. Applying its chosen definition of “lead,” the majority concluded that “the effect of the impairment on the course of a plaintiffs entire normal life must be considered,” and if “the course or trajectory of the plaintiffs normal life has not been affected, then the plaintiffs ‘general ability’ to lead his normal life has not been affected. . . .” Kreiner, 471 Mich at 131. In other words, the Kreiner majority held that the “common meaning” of whether an impairment has affected “the person’s general ability to lead his or her normal life” is whether it has affected the person’s general ability to conduct the course or trajectory of his or her entire normal life. This “common meaning” is quite different from the actual statutory text in form and substance. Significantly, the Kreiner majority’s interpretation of the statute interjects two terms that are not included in the statute or the dictionary definitions of the relevant statutory language: “trajectory” and “entire.” Both terms create ambiguity where the original statutory text had none, and the Kreiner majority thus erred by selectively defining the words used in definitions of statutory terms in order to shift away *206 from the common meaning that the words have in the context of MCL 500.3135(7).
As to the first addition, while “trajectory” is a synonym for “course” when “course” is defined as, for example, “[t]he direction of continuing movement,” The American Heritage Dictionary, Second College Edition (1982), it is not a synonym for the definition of “course” that makes sense in the context of defining a “general ability to lead his or her normal life.” When “conduct” is used with this definition of “course,” it has the very different meaning of “[t]o direct the course of; control.” Id. The plain language of the statute does not suggest that the Legislature’s intent was to address the effect of an impairment on the person’s ability to control the direction of their life, as opposed to its effect on the person’s ability to live in his or her normal manner of living. Yet the majority managed to imply this meaning by inserting “trajectory” as a synonym for “course,” thereby shifting the meaning of “course” from the most natural contextual reading of the word. The use of “trajectory” and the suggestion that “course” should be understood to mean “the direction of continuing movement,” instead of “a mode of action or behavior,” creates ambiguity by implying a sense of permanence that is inconsistent with, and does not make sense in the context of, the actual statutory language.
As to the second addition, the majority modified the statutory language “his or her normal life” with “entire,” a modification that it apparently created out of thin air,[17] thereby creating an ambiguity that had not previously existed in the statutory text. The word “life” *207 has more than one meaning. As noted, it can refer to the meaning that would be commonly understood to apply in the context of the statutory language, which is “a manner of living.” It also can refer to “[t]he interval of time between birth and death; lifetime.” The American Heritage Dictionary, Second College Edition (1982). The differences are significant: whereas the first meaning refers to the day-to-day process of living, the second is a finite measure that encompasses all of one’s time on earth. Although “entire” could modify either meaning of “life,” it is probably more commonly used to modify the second. Thus, by inserting “entire,” the Kreiner majority created an ambiguity that is not present in the original statutory text because the second, finite definition of “life” does not make sense in the context of the actual statutory language. It would be unusual to refer to someone’s general ability to lead his or her normal “lifetime” or “interval of time between life and death.” At best, this would seem to refer to an effect on the person’s life expectancy, but this would not be a subjective inquiry, and it is an impossible leap from any common understanding of the statutory language.[18] At a minimum, using the modifier “entire” reinforces the general sense of permanence that is also created by the insertion of “trajectory,” but which, as explained, is not in the actual statutory text. Because the Kreiner majority created ambiguity where there was none, and crafted a statutory interpretation that is, in effect, a judicially constructed house of cards, we hold that it incorrectly interpreted the third prong of MCL 500.3135(7).
The Kreiner majority aggravated this error, and departed even more dramatically from the statutory text, by providing an extra-textual “nonexhaustive list *208 of objective factors” to be used to compare the plaintiffs pre- and post-incident lifestyle. These factors are: “(a) the nature and extent of the impairment, (b) the type and length of treatment required, (c) the duration of the impairment, (d) the extent of any residual impairment, and (e) the prognosis for eventual recovery.” Kreiner, 471 Mich at 133.[19] The Legislature has unambiguously defined the “serious impairment of body function,” and the role of this Court is to apply the plain language of that definition, not to improve it with a list of judicially created factors that are not necessarily based in the statute’s text. In fact, at least some of the Kreiner majority’s factors have no basis in the statutory text and are instead derived from its extra-textual and extra-definitional additions to the actual statutory language, “entire” and “trajectory,” and serve to reinforce the ambiguity that its interpretation of the third prong created, especially given that all of the factors expressly or impliedly include a temporal component. Because the factors adopted by the Kreiner majority are not based in the statutory text, and this Court’s role is to apply the unambiguous statutory language, not improve it, we hold that the majority erred by adopting them.[20]
*209 In summary, the Kreiner majority’s interpretation of the third prong departed from the idea that a court “should not casually read anything into an unambiguous statute that is not within the manifest intent of the Legislature as derived from the words of the statute.” Kreiner, 471 Mich at 157 (CAVANAGH, J., dissenting). Indeed, as I remarked in dissent, the Kreiner majority’s “interpretation” of the plain language of MCL 500.3135(7) was a “chilling reminder that activism comes in all guises, including so-called textualism.” Id. Therefore, we hold that the Kreiner majority’s interpretation of this prong, including the list of non-exhaustive factors, is not based in the statute’s text and is incorrect.
3. STARE DECISIS: SHOULD KREINER BE OVERRULED?
To the extent that the Kreiner majority’s interpretation of the statute was inconsistent with the foregoing approach, and departed from the legislative intent expressed in the unambiguous language of the statute, we hold that it was wrongly decided. Given this conclusion, the question is whether it should be overruled. We hold that it should be.[21]
Under the doctrine of stare decisis, “principles of law deliberately examined and decided by a court of compe *210 tent jurisdiction should not be lightly departed.” Brown v Manistee Co Rd Comm, 452 Mich 354, 365; 550 NW2d 215 (1996) (citations and quotation marks omitted). Indeed, in order to “ ‘avoid an arbitrary discretion in the courts, it is indispensable that [courts] should be bound down by strict rules and precedents which serve to define and point out their duty in every particular case that comes before them ....’” Petersen v Magna Corp, 484 Mich 300, 314-315; 773 NW2d 564 (2009) (opinion by KELLY, C.J.), quoting The Federalist No. 78, p 471 (Alexander Hamilton) (Clinton Rossiter ed, 1961). As the United States Supreme Court has stated, the doctrine “promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.” Payne v Tennessee, 501 US 808, 827; 111 S Ct 2597; 115 L Ed 2d 720 (1991).
Despite its importance, stare decisis is neither an “inexorable command,” Lawrence v Texas, 539 US 558, 577; 123 S Ct 2472; 156 L Ed 2d 508 (2003), nor “a mechanical formula of adherence to the latest decision,” Helvering v Hallock, 309 US 106, 119; 60 S *211 Ct 444; 84 L Ed 604 (1940). Ultimately, it is an attempt “to balance two competing considerations: the need of the community for stability in legal rules and decisions and the need of courts to correct past errors.” Petersen, 484 Mich at 314. As a reflection of this balance, there is a presumption in favor of upholding precedent, but this presumption may be rebutted if there is a special or compelling justification to overturn precedent. Id. at 319-320. In determining whether a special or compelling justification exists, a number of evaluative criteria may be relevant, id., but overturning precedent requires more than a mere belief that a case was wrongly decided, see Brown, 452 Mich at 365.[22]
In determining whether Kreiner should be overruled, I find several evaluative criteria particularly relevant: (1) “whether the rule has proven to be intolerable because it defies practical workability,” (2) “whether reliance on the rule is such that overruling it would cause a special hardship and inequity,” (3) “whether upholding the rule is likely to result in serious detriment prejudicial to public interests,” and (4) “whether the prior decision was an abrupt and largely unexplained departure from precedent.” Petersen, 484 Mich at 320. As applied here, on the balance, these criteria weigh in favor of overturning Kreiner.
The first criterion weighs heavily in favor of overruling Kreiner because the Kreiner majority’s departure from the plain language of MCL 500.3135(7) defies practical workability. As discussed above, the majority took unambiguous statutory text and, through linguistic gymnastics, contorted it into a confusing and am *212 biguous test. Appellate litigation arising out of MCL 500.3135(7) has greatly increased since Kreiner[23] and has resulted in confusion. To begin with, the lower courts’ application of Kreiner has led to inconsistent interpretation of the statutory language, with similarly situated plaintiffs being treated differently by different courts.[24] Further, some courts have interpreted Kreiner as having created a threshold that is higher than that in Cassidy or DiFranco, primarily by reading the Kreiner majority’s interpretation of the statute to effectively create a permanency requirement.[25] As discussed, this is contrary to the legislative intent expressed by the plain language of the statute. Because the Kreiner majority’s interpretation of the third prong of MCL *213 500.3135(7) has created ambiguity where there was none, and increased litigation and confusion, the first factor weighs heavily in favor of overruling Kreiner.
Second, correcting the errors in the Kreiner majority’s interpretation of MCL 500.3135(7) would not present an undue hardship to reliance interests, and this factor weighs in favor of overruhng Kreiner. As this Court has explained when evaluating a similar factor in the past, “the Court must ask whether the previous decision has become so embedded, so accepted, so fundamental, to everyone’s expectations that to change it would produce not just readjustments, but practical real-world dislocations.” Robinson v Detroit, 462 Mich 439, 466; 613 NW2d 307 (2000). It further stated that this factor applies to cases that if overruled, “even if they were wrongfully decided, would produce chaos.” Id. at 466 n 26. Kreiner is not “so” embedded, accepted, or fundamental to expectations that chaos will result from overruhng it. To begin with, Kreiner was decided only six years ago, and, while it was the first opinion from this Court interpreting MCL 500.3135(7), it was contrary to the plain text of the statute, which had been in place since 1995. As the Robinson majority explained, people normally rely on the words of the statute itself when looking for guidance on how to direct their actions. Robinson, 462 Mich at 467. Further, it is unlikely that motor vehicle drivers, and the victims of motor vehicle accidents, have altered their behavior in reliance on Kreiner. As noted by the Robinson majority, where a statute deals with the consequences of accidents, “it seems incontrovertible that only after the accident would... awareness [of this Court’s caselaw] come,” and “after-the-fact awareness does not rise to the level of a rebanee interest because to have rebanee the knowledge must be of the sort that causes a person or entity to attempt to conform his conduct to a certain norm before the triggering event.” Id. at 466-467. Similarly, this *214 statute generally involves motor vehicle accidents, and it strains credibility to think that the average driver and the average future injured party have altered their behavior in reliance on Kreiner.
The third criterion, the effect on the public interest, also weighs in favor of overruling Kreiner. Although there may be policy arguments on both sides regarding the costs and benefits of having a more or less difficult threshold for recovery under MCL 500.3135, our interpretation of the statute in this case is truer to the statute’s text than that of the Kreiner majority, and, thus, our interpretation most closely reflects the policy balance struck by the Legislature.[26] In contrast, Kreiner altered the balance from that intended by the Legislature by imposing extra-textual burdens to meeting the threshold, and, as a result, it is difficult to argue that overruling Kreiner to restore the balance intended by the Legislature would hurt the public interest (or that affirming Kreiner serves it).
Finally, the fourth criterion is neutral. Kreiner was not an abrupt change from precedent, but it did provide an interpretation of the statute that was not obvious from the statute’s text.
On the basis of these evaluative criteria, we hold that Kreiner should be overruled.
*215 4. SUMMARY OF LEGISLATIVE TEST
On the basis of the foregoing, the proper interpretation of the clear and unambiguous language in MCL 500.3135 creates the following test.
To begin with, the court should determine whether there is a factual dispute regarding the nature and the extent of the person’s injuries and, if so, whether the dispute is material to determining whether the serious impairment of body function threshold is met. MCL 500.3135(2) (a)(¿) and (ii).[27] If there is no factual dispute, or no material factual dispute, then whether the threshold is met is a question of law for the court. Id.
If the court may decide the issue as a matter of law, it should next determine whether the serious impairment threshold has been crossed. The unambiguous language of MCL 500.3135(7) provides three prongs that are necessary to establish a “serious impairment of body function”: (1) an objectively manifested impairment (observable or perceivable from actual symptoms or conditions) (2) of an important body function (a body function of value, significance, or consequence to the injured person) that (3) affects the person’s general ability to lead his or her normal life (influences some of the plaintiffs capacity to live in his or her normal manner of living).
The serious impairment analysis is inherently fact- and circumstance-specific and must be conducted on a case-by-case basis. As stated in the Kreiner dissent, “[t]he *216 Legislature recognized that what is important to one is not important to all[;] a brief impairment may be devastating whereas a near permanent impairment may have little effect.” Kreiner, 471 Mich at 145 (CAVANAGH, J., dissenting). As such, the analysis does not “lend itself to any bright-line rule or imposition of [a] nonexhaustive list of factors,” particularly where there is no basis in the statute for such factors. Id. Accordingly, because “[t]he Legislature avoided drawing lines in the sand... so must we.” Id.
C. APPLICATION OF MCL 500.3135
Under the facts of this case, we hold that plaintiff has met the serious impairment threshold as a matter of law.
To begin with, there is no factual dispute that is material to determining whether the serious impairment threshold is met. The parties do not dispute that plaintiff suffered a broken ankle, was completely restricted from bearing weight on his ankle for a month, and underwent two surgeries over a 10-month period and multiple months of physical therapy. The parties do dispute the extent to which plaintiff continues to suffer a residual impairment and the potential for increased susceptibility to degenerative arthritis. Plaintiff has provided at least some evidence of a physical basis for his subjective complaints of pain and suffering,[28] but defendant disputes whether there is persuasive evidence of impairment beyond plaintiffs subjective complaints. This dispute is not significant or essential to determining whether the serious impairment threshold *217 is met in this case, however, because plaintiff has not alleged that the residual impairment, to the extent that it exists, continues to affect his general ability to lead his pre-incident “normal life,”[29] the third prong of the analysis. Moreover, it is not necessary to establish the first two prongs. Therefore, the dispute is not material and does not prevent this Court from deciding whether the threshold is met as a matter of law under MCL 500.3135(2)(a).
The other facts material to determining whether the serious impairment threshold is met are also undisputed.[30] Before the incident, plaintiffs “normal life” consisted primarily of working 60 hours a week as a medium-duty truck loader. Plaintiff also frequently fished in the spring and summer and was a weekend golfer. After the incident, plaintiff was unable to return to work for at least 14 months and did not return for 19 months. He never returned to his original job as a medium-duty truck loader, but he suffered no loss in pay because of the change in job. He was able to fish at pre-incident levels by the spring of 2006 and is able to take care of his personal needs at the same level as before the incident. There is no allegation that the impairment of body function has affected his relationship with his significant other or other qualitative aspects of his life.
Next, in light of the lack of a factual dispute that is material to determining whether the threshold is met, *218 under MCL 500.3135(2)(a), this Court should decide as a matter of law whether plaintiff suffered a serious impairment of body function under the three prongs of MCL 500.3135(7).
With regard to the first prong, plaintiff has shown an objectively manifested impairment of body function. There is no dispute that plaintiff has presented evidence that he suffered a broken ankle and actual symptoms or conditions that someone else would perceive as impairing body functions, such as walking, crouching, climbing, and lifting weight. Even 14 months after the incident, an FCE report observed that ankle pain and a reduced range of motion inhibited these body functions. Thus, plaintiff has satisfied this prong.
With regard to the second prong, the impaired body functions were important to plaintiff. His testimony establishes that being unable to walk and perform other functions were of consequence to his ability to work. Thus, the second prong of MCL 500.3135(7) is met.
The next question in this case is whether the third prong is met, but we hold that plaintiff has shown that the impairment affected his general ability to lead his normal life because it influenced some of his capacity to live in his normal, pre-incident manner of living. Before the incident, plaintiffs normal manner of living consisted primarily of working, for 60 hours a week, and secondarily of enjoying his hobbies of fishing and golfing. After the incident, at least some of plaintiffs capacity to live in this manner was affected. Specifically, for a month after the incident, plaintiff could not bear weight on his left ankle. He underwent two surgeries over a period of 10 months and multiple months of physical therapy. Moreover, his capacity to work, the central part of his pre-incident “normal life,” was *219 affected.[31] Whereas before the incident he spent most of his time working, after the incident he was unable to perform functions necessary for his job for at least 14 months, and he did not return to work for 19 months.[32] On the basis of these facts, we conclude that some of plaintiffs capacity to live in his pre-incident manner of living was affected, and the third prong of MCL 500.3135(7) is satisfied.[33]
Because all three prongs of MCL 500.3135(7) are satisfied, we hold, as a matter of law, that plaintiff has met the serious impairment threshold requirement under MCL 500.3135(1).
D. RESPONSE TO THE DISSENT
Despite the dissent’s length, it provides very little substantive disagreement or criticism of the statutory interpretation presented in this opinion and very little response to our criticisms of the statutory interpretation in Kreiner. Where the dissent does actually address the substance of the opinion, its criticisms are often *220 based not on the actual holdings of the majority opinion but, instead, on the dissent’s misunderstandings or overgeneralizations of those holdings.
For example, the dissent complains that the majority “resuscitate[s]” my opinion in DiFranco.[34] As a result, the dissent resuscitates old criticisms of DiFranco and attacks the majority for failing to recognize the Legislature’s intent, as expressed in the statute’s legislative history, to reject DiFranco in favor of Cassidy.[35] As is plainly evident in the analysis, however, this opinion faithfully applies the text of the statute, even where that text is inconsistent with DiFranco. The opinion fully recognizes the Legislature’s adoption of Cassidy where the Legislature indicated an intent to do so through the text of the statute and “resuscitates” Di-Franco only in the narrow places where, similarly, the statutory text indicates a legislative intent to do so.[36]
Additionally, the dissent’s comments on the majority’s lack of use of legislative history are ill-founded on two levels. First, contrary to the dissent’s assertion that I have “never questioned [the] utility” of legislative history and that “there is no principled reason” not to use it in this case, I have repeatedly stated that legislative *221 history should only be used to interpret a statute when statutory language is ambiguous. See, e.g., People v Gardner, 482 Mich 41; 753 NW2d 78 (2008) (CAVANAGH, J., dissenting); Bukowski v Detroit, 478 Mich 268; 732 NW2d 75 (2007) (CAVANAGH, J., concurring); Lansing Mayor v Pub Serv Comm, 470 Mich 154, 174; 680 NW2d 840 (2004) (CAVANAGH, J., dissenting).[37] The statutory language at issue here is not ambiguous.[38] Second, even if legislative history should be used, our application of the plain language of the statute is consistent with the House legislative analysis’s statement that the amendments were intended to return the law to a threshold “resem *222 bling” Cassidy. House Legislative Analysis, HB 4341, December 18, 1995. The dissent’s statements to the contrary are, again, largely based on its mistaken characterization of the majority opinion as resuscitating DiFranco and ignoring Cassidy.
The dissent also repeatedly states that the majority opinion holds that temporal considerations are “wholly or largely irrelevant” to the serious impairment threshold, and, accordingly, it spends a significant amount of energy explaining why temporal considerations are relevant and accusing the majority of holding that the threshold is met if the “plaintiffs general ability to lead his normal life has been affected for even a single moment in time....” Contrary to the dissent’s cries, there is simply no basis in our analysis for concluding that we hold that temporal considerations are irrelevant or that a momentary impairment is sufficient. This opinion merely notes that there is no specific express temporal requirement in the text of the statute and rejects Kreiner’s strained attempts to insert what was essentially a permanency requirement into the statute.[39] The dissent’s mistaken characterizations of this opinion amount to nothing more than, like Kreiner itself, yet another attempt to distract courts and parties from the actual text of MCL 500.3135.
IV CONCLUSION
We hold that Kreiner should be overruled because the Kreiner majority’s interpretation of MCL 500.3135 departed from the statute’s clear and unambiguous text. *223 Applying the unambiguous statutory language, we hold that as a matter of law, in this case, plaintiff established that he suffered a serious impairment of body function. Thus, we reverse the Court of Appeals and remand the case to the trial court for proceedings consistent with this opinion.
Kelly, C.J., and Weaver (except for part III[B][3]) and Hathaway, JJ., concurred with Cavanagh, J.

 The only defendant remaining at this point in the case is GM’s indemnitor, Allied Automotive Group, Inc, because the parties have stipulated the release of the other original defendants. For simplicity’s sake, the opinion will use “defendant” to refer to this entity.

 The medial malleolus is the bony prominence that protrudes from the medial side of the ankle. Stedman’s Medical Dictionary (26th ed).

 Plaintiff had a pre-existing back and shoulder injury that is unrelated to the incident in this case.

 There are no facts in the record regarding the extent to which plaintiff fished between January 2005 and January 2006 or the extent to which he was able to golf in the period between the incident and when he returned to work, despite the arguments to the contrary by both parties and the dissent. Defendant has alleged that plaintiff was able to fish while he was not working, but the only factual support it cites is plaintiffs statement that he fished in the six or seven months after January 2006, which was when he was initially cleared to return to work, and when he actually returned to work. Although plaintiffs counsel agreed in the arguments before the trial court that plaintiff had been fishing, it was unclear as to what time period he was referring. In plaintiffs brief to this Court, he alleges that by the time of his deposition, he had “returned” to fishing with the same frequency as before the accident, which suggests that plaintiff might be arguing that his fishing activities were interrupted.

 Some courts have broadly stated that the Legislature rejected DiFranco in favor of Cassidy, see Kreiner, 471 Mich at 121 n 8, but that is an oversimplification. Some of the language adopted by the Legislature was used consistently in both DiFranco and Cassidy, and the Legislature clearly rejected some elements of Cassidy. The similarities and differences between DiFranco and Cassidy and the amendments of MCL 500.3135 will be discussed below to the extent that they are significant. Although the dissent disagrees in the abstract with my statement that it is an oversimplification to state that the Legislature merely rejected DiFranco in favor of Cassidy, I can only conclude that it is unable to support this accusation with any specific, substantive arguments, given that it fails to expressly address or reject my more nuanced analysis of each of the specific phrases that the Legislature adopted or rejected from Cassidy and DiFranco.

 This Court’s members disagree on when a statute is ambiguous. See Petersen v Magna Corp, 484 Mich 300, 310-313; 773 NW2d 564 (2009) (opinion by Kelly, C.J.); id. at 339-342 (opinion by Hathaway, J.). We need not address that issue here because MCL 500.3135 is unambiguous under any of the views.

 Notably, MCL 500.3135(2)(a) could unconstitutionally conflict with MCR 2.116(0(10) in those cases wherein a court is required to (1) resolve material, disputed facts with regard to issues other than the nature and extent of the injury, such as the extent to which the injury actually impairs a body function or the injured party relied on that function as part of his or her pre-accident life, or (2) decide whether the threshold is met even though reasonable people could draw different conclusions from the facts. See Skinner v Square D Co, 445 Mich 153, 161-162; 516 NW2d 475 (1994), and Henderson v State Farm Fire & Cas Co, 460 Mich 348, 357; 596 NW2d 190 (1999).
Given that the allocation of decision-making authority between a judge and a jury is “a quintessentially procedural determination,” Shropshire v Laidlaw Transit, Inc, 550 F3d 570, 573 (CA 6, 2008), this potential conflict raises questions as to whether the Legislature may have unconstitutionally invaded this Court’s exclusive authority to promulgate the court rules of practice and procedure to the extent that MCL 500.3135(2)(a) is merely procedural. See Perin v Peuler (On Rehearing), 373 Mich 531, 541; 130 NW2d 4 (1964). We do not reach this issue today because we conclude that there are no material factual disputes affecting the serious impairment threshold determination in this case. Notably, however, the division of questions of law and fact between a judge and a jury is based on longstanding procedural rules, see Mawich v Elsey, 47 Mich 10, 15-16; 10 NW 57 (1881), that are intended to promote judicial efficiency, see Moll v Abbott Laboratories, 444 Mich 1, 26-28; 506 NW2d 816 (1993). Whether MCL 500.3135(2)(a) serves a purpose other than judicial dispatch is not clear, as the Legislature itself stated that the *194 Insurance Code was intended, in part, “to prescribe certain procedures for maintaining [tort liability arising out of certain accidents].” See the title of 1956 PA 218 and the title of 1995 PA 222, an act amending the provision of MCL 500.5135 and reiterating the purposes expressed in the 1956 act. And, of course, the scope of the rules governing summary disposition are also supported — if not compelled — by the right to a jury trial in civil cases. See, generally, Conservation Dep’t v Brown, 335 Mich 343, 346-347; 55 NW2d 859 (1952), and Dunn v Dunn, 11 Mich 284, 286 (1863). Accord Byrd v Blue Ridge Rural Electric Coop, Inc, 356 US 525, 537-538; 78 S Ct 893; 2 L Ed 2d 953 (1958). Interestingly, the dissent states that it disagrees with the majority that there could be a conflict between the statute and the court rule, but it also approvingly quotes DiFranco for the proposition that reasonable minds can often differ over the threshold issues in these cases.

 This plain reading of the statute is not necessarily inconsistent with the Kreiner majority’s interpretation of MCL 500.3135(2)(a), see Kreiner, 471 Mich at 131-132, but neither the majority nor dissent in Kreiner discussed the constitutionality of this provision. As noted in footnote 7 of this opinion, however, the manner in which Kreiner interpreted the statute may be unconstitutional to the extent that it requires a court to usurp the role of the fact-finder. That issue is not presented on the facts of this case, however.

 The Kreiner majority first addressed whether the impaired body function was important and then analyzed whether the impairment was objectively manifested. Kreiner, 471 Mich at 132-133. We find it more consistent with the statutory text to first address the objectively manifested impairment requirement.

 See also Webster’s Third New International Dictionary (1966), defining “objective,” in relevant part, as “publicly or intersubjectively observable or verifiable especially by scientific methods: independent of what is personal or private in our apprehension and feelings: of such nature that rational minds agree in holding it real or true or valid.” It also defines “objective” in the context “of a symptom of disease” as “perceptible to persons other than an affected individual.” Id. (italics omitted).

 Accordingly, the Court of Appeals decisions that have gone beyond the plain language of the statute and imposed an extra-textual “objectively manifested injury” requirement, in clear contravention of legislative intent, are overruled to the extent that they are inconsistent with this opinion. See, e.g., Netter v Bowman, 272 Mich App 289, 305; 725 NW2d 353 (2006) (holding that “the current meaning of ‘objectively manifested’ .. . requires that a plaintiffs injury must be capable of objective verification”).

 Although the Legislature plainly rejected that it is the injury that should be objectively manifested, as opposed to the impairment, the previous judicial construction of “objectively manifested” is still relevant.

 Cassidy also held that the importance of a body function is an objective standard based on its effect on “the person’s general ability to live a normal life.” Cassidy, 415 Mich at 505 (emphasis added). As discussed below, however, the Legislature specifically rejected the idea that the normal life evaluation should be objective, and, thus, implicitly rejected Cassidy’s determination that whether a body function is “important” could be objectively determined outside the context of the person’s actual life. Notably, DiFranco is inapposite because it rejected the “important body function” test. DiFranco, 427 Mich at 61-62.

 The Kreiner majority also apparently agreed that this is a subjective, case-by-case inquiry. Kreiner, 471 Mich at 134 n 19.

 See Random House Webster’s Unabridged Dictionary (1998), defining “lead” as “to go through or pass (time, life, etc.): to lead a full life,” and Webster’s Third New International Dictionary (1966), defining it as “to go through (life or some other period of time): PASS, UVE Cthere he led a very peaceful existences”

 Although some of this prong’s text is derived from Cassidy, the Legislature made important modifications. The Cassidy Court stated that the serious impairment threshold “looks to the effect of an injury on the person’s general ability to live a normal life,” Cassidy, 415 Mich at 505, and the Legislature rejected that the standard for “a” normal life was objective.

 The Kreiner majority did define “in general” as “with respect to the entirety” when interpreting “general ability.” Kreiner, 471 Mich at 130. But, even assuming that it is proper to use the definition of the phrase “in general” to define the adjective “general,” the Legislature used general to modify ability, not life.

 It is also to some extent accounted for in another threshold in MCL 500.3135(1): death.

 The dissent correctly observes that I do not object to courts employing factors when applying statutes in many circumstances. I certainly object, however, to courts doing so in a manner that not only perverts the statutory language but is also unsupported by, and inconsistent with, the legislative intent expressed by the statutory language, as the Kreiner majority did.

 Indeed, the potential for the Kreiner majority’s interpretation to be read in a manner that is inconsistent with the statute has been realized in lower court decisions. For example, in Gagne v Schulte, unpublished opinion per curiam of the Court of Appeals, issued February 28, 2006 (Docket No. 264788), the Court of Appeals held that a plaintiff had not suffered a serious impairment of body function even though her knee injury resulted in surgery and severe restrictions on her movement for a year after the accident, indefinite continuing restrictions on her ability to perform her pre-accident job and other activities in which she participated before the accident, and a permanent loss of stability in her knee *209 and an increased risk of osteoarthritis. The majority reasoned that these impairments were insufficient to meet the threshold because she might someday be able to resume some activities with a knee brace and “there is no evidence that this period of decreased function affected her life so extensively that it altered the trajectory or course of her entire normal life.” Id., unpub op at 2. Indeed, the majority’s reasoning seemed to consider whether the plaintiffs ability to control the direction of her entire life had been altered, rather than her ability to live her life in a normal manner, given that it found the threshold was not met despite evidence that the plaintiff had continuing restrictions on movement, activities, and work, and medically documented long-term damage.

 The dissenters’ stare decisis protestations should taste like ashes in their mouths. To the principles of stare decisis, to which they paid *210 absolutely no heed as they denigrated the wisdom of innumerable predecessors, the dissenters now would wrap themselves in its benefits to save their recent precedent.
Ironically, the very doctrine and approach that the dissent vehemently claims to adhere to today, from Robinson v Detroit, 462 Mich 439; 613 NW2d 307 (2000), was not so faithfully applied by the members of the dissent in the past. Indeed, the members of the dissent have overruled caselaw without even paying lip service to Robinson, see, e.g., People v Anstey, 476 Mich 436; 719 NW2d 579 (2006), or after engaging in a cursory or limited analysis of the factors that they claim fidelity to today, see, e.g., Wesche v Mecosta Co Rd Comm, 480 Mich 75, 91 n 13; 746 NW2d 847 (2008); Al-Shimmari v Detroit Med Ctr, 477 Mich 280, 297 n 10; 731 NW2d 29 (2007); Neal v Wilkes, 470 Mich 661, 667 n 8; 685 NW2d 648 (2004); People v Hickman, 470 Mich 602, 610 n 6; 684 NW2d 267 (2004); Mach v Detroit, 467 Mich 186, 203 n 19; 649 NW2d 47 (2002).

 In Petersen, Chief Justice Kelly provided a non-exhaustive list of criteria that may be considered, but none of the criteria is determinative, and they need only be evaluated if relevant. See Petersen, 484 Mich at 320.

 In the six years since Kreiner was decided, there have been three times as many Court of Appeals cases citing MCL 500.3135(7) as there were in the nine years between when the amendment was enacted and Kreiner was decided. In the nine years between when the amendment became effective and Kreiner was decided, only 86 Court of Appeals cases cited MCL 500.3135(7). As of May 27, 2010, in the six years since the Kreiner decision was issued, there have been 254 Court of Appeals cases citing MCL 500.3135(7).

 For example, in Luther v Morris, unpublished opinion per curiam of the Court of Appeals, issued January 18, 2005 (Docket No. 244483), the Court held that the plaintiff had suffered a serious impairment of body function where a dislocated elbow caused her to miss 52 days of work and significantly interfered with her ability to perform daily personal tasks for a while, but her life returned to normal within a couple of months after the accident. In contrast, in Guevara v Martinez, unpublished opinion per curiam of the Court of Appeals, issued May 24, 2005 (Docket No. 260387), the Court held that there was no serious impairment where the plaintiff suffered a dislocated right shoulder and a torn anterior rotator cuff that significantly interfered with his ability to perform daily personal tasks for a couple of months and prevented him from continuing work as a part-time construction worker during at least the surgery and multiple months of rehabilitation. The outcomes in these cases are difficult to reconcile.

 See footnote 20 of this opinion summarizing Gagne v Schulte, unpublished opinion per curiam of the Court of Appeals, issued February 28, 2006 (Docket No. 264788).

 The dissent devotes a significant amount of time conducting what is essentially a policy analysis hypothesizing about the disastrous effects that this opinion will have on the insurance industry and, thus, concluding that we are undoing the legislative compromise that was the general backdrop of the no-fault act. While I am cognizant of the legislative compromise, I am less convinced than the dissent that this Court’s role is to conduct an independent policy analysis to determine whether the plain language of an amendment adopted by the Legislature, 20 years after the no-fault act was originally adopted, is inconsistent with the overall act’s general purposes. Even assuming arguendo that it could be, I do not believe that broad statements regarding the general purpose of the act’s adoption in 1973 trump the intent expressed by the Legislature in the plain language of a later amendment to the act.

 As discussed in footnotes 7 and 8 of this opinion, this provision may unconstitutionally conflict with MCR 2.116(C)(10) in certain cases. If it does, then a court should only apply MCL 500.3135(2) to the extent that it is consistent with MCR 2.116(0(10). We do not reach this issue today, however, because there is no material factual dispute over any fact necessary to determining whether the serious impairment threshold has been met.

 The FCEs reported that plaintiffs range of motion in his ankle is not within normal limits, and the MRI and two doctors’ reports suggested at least some scarring and degenerative tissue damage around plaintiffs left ankle.

 Plaintiff stated that his life is “painful, but normal.” He does not allege that any residual impairment has a significant effect on his ability to participate in or enjoy activities to the extent that he could before the accident.

 If there had been other disputed facts that were material to this determination, we would have to reach the question whether MCL 500.3135(2)(a) is unconstitutional to the extent that it requires a court to decide material disputed facts as a matter of law. See footnote 7 of this opinion.

 As noted, it is unclear from the record the extent to which the impairment affected plaintiffs ability to fish in the first year after the incident or his ability to golf in the first year and a half after the incident, or the extent to which he actually undertook either activity in those periods.

 It could be significant that plaintiffs job has changed, even though his pay is the same, but there is no evidence suggesting that this was an effect of impairment. Therefore, this fact is not relevant to the “normal life” inquiry here.

 Our analysis focuses on plaintiffs pre- and post-incident activities and the extent to which he was able to participate in them after the incident because those are the facts in the record. The facts that the parties considered relevant in developing the record were, no doubt, influenced by the Kreiner majority’s erroneous deviation from the statutory language. As noted, however, many other considerations could typically he relevant to determining how an impairment affects a person’s ability to live in his or her pre-incident normal manner of living.

 The only explanation that I can discover for the dissent’s reaching this conclusion is its baseless accusation that the majority is essentially reading the third prong out of the statute. It is unclear to me, however, how reading and applying the plain text of the statute, instead of enhancing and extending the statute through creative use of a thesaurus and extra-textual factors, could equate with reading that language out of the statute.

 Interestingly, while criticizing the majority for supposedly reviving DiFranco, the dissent also criticizes us for not going far enough in its revival by not adopting the factors that I used in DiFranco.

 It appears that the dissent itself does not actually believe that we are resuscitating DiFranco, given that it so vigorously, albeit erroneously, argues that the only difference between our decision today and Kreiner is that Kreiner adopted temporal requirements.

 To the extent the dissent insinuates that I have relied on legislative history to interpret an unambiguous statute, it is reaching. None of the cases that the dissent cites involves instances where I relied on legislative history to identify an ambiguity or give unambiguous text a meaning inconsistent with the plain language of the statute. In most, I merely emphasized that the legislative history confirmed the meaning in the unambiguous text. See, e.g., Jackson v Green Estate, 484 Mich 209, 230; 771 NW2d 675 (2009) (CAVANAGH, J., dissenting); Koester v City of Novi, 458 Mich 1, 16; 580 NW2d 835 (1998); People v Sloan, 450 Mich 160, 183-184; 538 NW2d 380 (1995); Grand Trunk W R Co v City of Fenton, 439 Mich 240, 247; 482 NW2d 706 (1992).

 The dissent references Judge Leventhal’s remark that using legislative history for statutory interpretation is the equivalent of walking into a crowded room and looking for one’s friends. Similar to my approach, however, this analogy has been used by justices of the United States Supreme Court to explain why legislative history should not be used to interpret clear and unambiguous statutory language. See Exxon Mobil Corp v Allapattah Servs, Inc, 545 US 546, 568-570; 125 S Ct 2611; 162 L Ed 2d 502 (2005), using the criticism to explain that legislative history should not he used to determine whether Congress intended an otherwise unambiguous statute to overrule a court’s interpretation of an earlier version of the statute because “[ejxtrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature’s understanding of otherwise ambiguous terms.” See also Conroy v Aniskoff, 507 US 511, 518-519; 113 S Ct 1562; 123 L Ed 2d 229 (1993) (Scalia, J., concurring) (using the criticism to explain why the majority should have stopped its analysis after concluding that a statute was unambiguous).

 Indeed, the dissent is so blindly intent on concluding that the majority must be rejecting temporal considerations that it fails to consider that its triumphant discovery of the majority’s hypocrisy in referencing time periods in our application of MCL 500.3135(2) is nothing more than a reflection of the fact that we are not holding that temporal considerations are irrelevant.