# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* HALISEK ESTATE.

JOY M. PODHORSKY, Personal Representative
of the Estate of JOHN CHARLES HALISEK,

        Appellee,

v

MARGARET STUTESMAN,

        Appellant.

UNPUBLISHED
January 20, 2015

No. 316543
Saginaw Probate Court
LC No. 07-120773-DE

*In re* STUART ESTATE.

CHARLES STUART II, Personal Representative
of the Estate of CHARLES E. STUART III,

        Appellant,

v

JOY M. PODHORSKY,

        Appellee.

No. 316545
Saginaw Probate Court
LC No. 06-119898-DE

Before: K. F. KELLY, P.J., and SAWYER and METER, JJ.

PER CURIAM.

This case centers on a dispute over the former home of the decedent, John C. Halisek. The probate court denied appellants' petition to discharge the estate's personal representative, to assess rent, to impose sanctions, and to provide other appropriate relief. The court also denied appellants' motion to resolve a settlement agreement and award attorney fees. Appellants now appeal as of right. We affirm.

-1-

On August 23, 2006, Charles E. Stuart II (Stuart II), the decedent's son-in-law and personal representative of the Estate of Charles E. Stuart III, initiated suit against appellee Joy Podhorsky, claiming rights in a manufactured home appellee and Charles Stuart III previously shared. As a result, Stuart II and appellee entered a settlement agreement that granted the former 2% of the net proceeds from the sale of the decedent's home. The agreement also included the following proviso:

> From the date Defendant moves into the home of John Halisek, whose address is described above, Joy Podhorsky alone and individually will be responsible for paying all usual property taxes, utilities, maintenance, insurance, and the normal and usual expenses for the upkeep of a home, whatever those expenses may be.

On February 28, 2007, appellant Margaret Stutesman, Halisek's daughter, filed a petition to set aside informal probate of her father's will, which named appellee as the sole beneficiary and personal representative of the Halisek estate, arguing that her father had been subject to undue influence when he executed the will. The lower court submitted the dispute to case evaluation, the parties accepted the panel's decision, and on April 8, 2008, the probate court issued a judgment pursuant to case evaluation that provided that the decedent's home be listed for sale, with appellee receiving 65% and appellant Stutesman receiving 35% of the net proceeds of any sale. The home eventually sold for $45,000 in 2013.

On April 3, 2013, appellants filed a motion to resolve the settlement agreement and award attorney fees, arguing that appellee failed to comply with the settlement agreement and case-evaluation judgment, failed to pay appellants their awarded percentages after sale of the decedent's home, failed to take personal responsibility for all taxes, insurance, and other expenses after representing that she had moved into the home, and breached her fiduciary duties as personal representative of the estate. The trial court denied appellants' motion.

## I. SECURED CLAIMS (PRIORITIES)

Appellants contend that because Stutesman is a secured creditor holding a lien against the home under the language of the case-evaluation judgment, she is not subject to the priority rules governing creditors of an insolvent estate set forth in the Estates and Protected Individuals Code (EPIC), MCL 700.1101 *et seq.* This issue was not preserved because it was not raised before, addressed by, or decided by the lower court. *Polkton Charter Twp v Pellegrom*, 265 Mich App 88, 95; 693 NW2d 170 (2005). We review unpreserved claims for plain error affecting substantial rights. *Huntington Nat'l Bank v Ristich*, 292 Mich App 376, 381; 808 NW2d 511 (2011). "'To avoid forfeiture under the plain error rule, three requirements must be met: 1) the error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights.'" *Kern v Blethen-Coluni*, 240 Mich App 333, 336; 612 NW2d 838 (2000), quoting *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

Under MCL 700.3805(1), where estate property is insufficient to pay all claims against the estate in full, the personal representative must make payments in the following order of priority:

(a) Costs and expenses of administration.

(b) Reasonable funeral and burial expenses.

(c) Homestead allowance.

(d) Family allowance.

(e) Exempt property.

(f) Debts and taxes with priority under federal law, including, but not limited to, medical assistance payments that are subject to adjustment or recovery from an estate under section 1917 of the social security act, 42 USC 1396p.

(g) Reasonable and necessary medical and hospital expenses of the decedent's last illness, including a compensation of persons attending the decedent.

(h) Debts and taxes with priority under other laws of this state.

(i) All other claims.

"EPIC treats secured creditors differently than other potential claimants against an estate." *In re Lundy Estate*, 291 Mich App 347, 354; 804 NW2d 773 (2011). According to MCL 700.3809, "[a] personal representative shall pay a secured claim on the basis of the amount allowed if the creditor surrenders the security."

Further, MCL 700.3104 provides:

(1) Except as otherwise provided in subsection (2), a proceeding to enforce a claim against a decedent's estate or the decedent's successors shall not be revived or commenced before the appointment of a personal representative. . . .

(2) This act does not apply to a proceeding by a secured creditor of the decedent to enforce the creditor's security except as provided in part 8 of article III and part 6 of article VII.

Thus, although general claimants against an estate must wait for the court to appoint a personal representative and abide by the general priority rules, EPIC statutory provisions do not prevent a secured creditor from exhausting their interest in a security. "On the contrary, [the statutes] treat a secured creditor differently and contemplate a secured creditor's right to collect from the security without bringing a claim against the estate for estate funds." *In re Lundy Estate*, 291 Mich App at 358-359. However, a secured party only has a priority position in the specific property acting as security, and "'[i]f the security is inadequate, the creditor has no preference when trying to collect any deficiency.'" *Id.* at 355, quoting *Estates and Protected Individuals Code With Reporter's Commentary* (ICLE, 2008 ed), p 226 (emphasis removed).

Appellants contend that Stutesman is a "secured creditor" who is not subject to EPIC priority rules because the case-evaluation judgment awarded her the right to 35% of the net proceeds of the decedent's home upon sale and created a lien against the decedent's home. EPIC does not define "secured creditor." In such a circumstance, "a dictionary may aid the Court in giving words and phrases . . . their common meaning . . . ." *McCormick v Carrier*, 487 Mich 180, 195; 795 NW2d 517 (2010).

*Black's Law Dictionary* (9th ed) defines "secured creditor" as "[a] creditor who has the right, on the debtor's default, to proceed against collateral and apply it to the payment of the debt." Further, "collateral" is defined as "[p]roperty that is pledged as security against a debt . . . ." *Id*. Thus, if Stutesman had an enforceable lien against the decedent's home representing a debt obligation owed by the Halisek estate, she would be permitted under EPIC to bypass the general priority rules and enforce the debt obligation to the extent the collateral, here the home, was sufficient to cover the outstanding debt.

However, Stutesman does not have an enforceable lien against the decedent's home. A judgment by itself does not establish a lien against property. *George v Sandor M Gelman, PC*, 201 Mich App 474, 477; 506 NW2d 583 (1993). Under Michigan's judgment lien statute (MJLS), MCL 600.2801 *et seq.*, "judgment lien" is defined as "an encumbrance in favor of a judgment creditor against a judgment debtor's interest in real property, including, but not limited to, after acquired property," MCL 600.2801(c). Although the MJLS provides a definition of "judgment,"[1] it does not include definitions for the terms "encumbrance," "judgment creditor," or "judgment debtor." *Id*.

*Black's Law Dictionary* (9th ed) defines "encumbrance" as a "claim or liability that is attached to property or some other right and that may lessen its value, such as a lien or mortgage; any property right that is not an ownership interest," and defines "lien" as a "legal right or interest that a creditor has in another's property, lasting usu. until a debt or duty that it secures is satisfied." "Judgment creditor" is defined as a "person having a legal right to enforce execution of a judgment for a specific sum of money," and "judgment debtor" is defined as a "person against whom a money judgment has been entered but not yet satisfied." *Id*. Thus, a judgment lien involves a creditor receiving a judgment for a specific monetary award against a debtor, granting the creditor authority to attach a lien to the debtor's real property to ensure payment of the specific monetary award.

---

[1] Under the act, "judgment" is defined, in part, as any final judgment of "[a] court of record in this state." MCL 600.2801(a)(*i*). Here, the judgment following case evaluation would constitute a "judgment" under MCL 600.2801(a)(*i*). Regarding case evaluation, MCR 2.403(M)(1) provides that "[i]f all the parties accept the panel's evaluation, judgment will be entered in accordance with the evaluation . . . ." Likewise, MCR 2.403(M)(1) explains that an agreement following case evaluation is a final judgment that "dipose[s] of all claims in the action and includes all fees, costs, and interest to the date it is entered . . . ."

Here, the case-evaluation judgment granting Stutesman a 35% interest in net proceeds upon sale of the decedent's home did not create a judgment lien because the award did not grant her any right to an interest in the decedent's home itself, did not articulate a specific monetary obligation owed by the estate, and did not include the right to attach a lien to the real property. Rather, the judgment granted Stutesman a right to 35% of the proceeds following sale of the home. Thus, Stutesman's judgment award following case evaluation is not a judgment lien.[2] Accordingly, appellants are not secured creditors and instead fall within the category of "All other claims" under EPIC priority rules. MCL 700.3805(1)(i).

## II. USE OF THE HOME

Appellants argue the trial court clearly erred in finding that appellee never moved into the decedent's home and therefore was not personally liable to cover all property-related expenses during the pendency of the probate case. We review for clear error a trial court's findings of fact following a bench trial, and review de novo a trial court's conclusions of law. *Trader v Comerica Bank*, 293 Mich App 210, 215; 809 NW2d 429 (2011). "A finding is clearly erroneous when a reviewing court is left with a definite and firm conviction that a mistake has been made, even if there is evidence to support the finding." *In re Estate of Bennett*, 255 Mich App 545, 549; 662 NW2d 772 (2003). On review, we will "not substitute our judgment for that of the trial court and make independent findings." *People v Galloway*, 259 Mich App 634, 638; 675 NW2d 883 (2003).

The trial court believed the testimony of appellee that, although she prepared the house for sale by painting, adding flooring, and staging the home, and although she left lights on and visited regularly to maintain the security of the home, she never moved into the home. Deferring to the court's credibility assessments, *id.*; see also MCR 2.613(C), we are not left with a definite and firm conviction that the trial court was mistaken about whether appellee had occupied the decedent's home.

Appellants further argue that communications by appellee's attorney now bind her to personally cover all property-related expenses of the decedent's home. We disagree. "It is a longstanding legal principle that a duly authorized agent has the power to act and bind the principal to the same extent as if the principal acted." *In re Estate of Capuzzi*, 470 Mich 399, 402; 684 NW2d 677 (2004). However, appellee's attorney did not act in a way that would obligate appellee to pay all property-related expenses of the decedent's home. Under the terms of the settlement agreement, appellee was only personally liable to cover property-related expenses "[f]rom the date [she] moves" into the decedent's home. Because the trial court did not

---

[2] Further, MCL 600.2805 requires that "[t]he clerk of a court that entered a judgment shall certify a notice of judgment lien that has been filed with the court . . . ." Likewise, MCL 600.2803 requires that for a judgment lien to attach to real property, a creditor must file a notice of the judgment lien in the register of deeds in the county where the real property is located. In the instant case, there is no evidence that the probate court issued a notice of judgment lien or that appellants ever filed such a notice with the register of deeds.

-5-

clearly err in finding appellee never moved into the decedent's home, it properly ruled she was not liable under the terms of the settlement agreement.

## III. PROMISSORY ESTOPPEL

Appellants contend that appellee is liable for all property-related expenses of the decedent's home under the doctrine of promissory estoppel. Appellants' did not raise this issue until they moved the court to reconsider its judgment. Where an issue is first presented in a motion for reconsideration, it is not properly preserved. *Pro-Staffers, Inc v Premier Mfg Support Servs, Inc*, 252 Mich App 318, 328-329; 651 NW2d 811 (2002). However, this Court may review an unpreserved issue if it involves a question of law and all the relevant facts are available or where review is necessary for a proper determination of the case. *Brown v Loveman*, 260 Mich App 576, 599; 680 NW2d 432 (2004). Such is the case here. Accordingly, we review this issue for plain error affecting substantial rights. *Kern*, 240 Mich App at 336.

The elements of promissory estoppel are:

(1) a promise, (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee, and (3) that in fact produced reliance or forbearance of that nature in circumstances such that the promise must be enforced if injustice is to be avoided. [*Novak v Nationwide Mut Ins Co*, 235 Mich App 675, 686; 599 NW2d 546 (1999).]

Courts should only apply the doctrine of promissory estoppel where the "facts are unquestionable and the wrong to be prevented undoubted." *Id*. at 687. "To be sufficient to support an estoppel, a promise must be definite and clear." *McMath v Ford Motor Co*, 77 Mich App 721, 726; 259 NW2d 140 (1977).

Appellants contend that communications by appellee's attorney while the parties negotiated the settlement agreement represented a promise that appellee would move or had moved into the home. The Restatement (Second) of Contracts defines "promise" as "a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." 1 Restatement Contracts, 2d, § 2, p 8.

The communications in issue from appellee's attorney are the following:

**Letter of November 20, 2008**

[P]ursuant to our phone conversation with Judge McGraw yesterday morning, I've instructed my client that she can move from the mobile home at her earliest convenience. She will be taking with her a washing machine, which was given to her two years ago by her mom and dad after Charlie died, her son's computer, her Direct TV box, and personal clothing and personal items. Everything else will remain.

**Letter of December 8, 2008**

I will agree that your qualification [that defendant pay all house-related expenses personally] applies beginning the date Ms. Podhorsky takes occupancy of the decedent's home.  Once again, if you agree with this, please sign, date and return fax this letter to me.

At one point during negotiations, appellee's attorney sent appellants' attorney a draft of a settlement agreement, but prefaced it with a letter.  The draft settlement agreement stated: "From December 22, 2008 when Defendant moved into the home of John Halisek . . . Joy Podhorsky alone and individually will be responsible for paying all usual property [expenses]." However, the letter accompanying the draft stated that the moving date was not certain:  "I'm faxing with this letter the revised Release and Settlement Agreement.  I've inserted your revisions, but am awaiting from my client the exact date she moved into the decedent's home.  I will insert that date on the first line of the paragraph B, 5."  In response, appellants' attorney sent the following letter:  "While I didn't want to leave the issue open-ended, I now think my client will sign the Release if you use the original language in paragraph B(5):  'From the date Defendant moves into the home of John Halisek.'"

These communications are not clear regarding whether appellee actually moved into the decedent's home.  The only clear and definite statement by appellee or her attorney regarding liability to cover property-related expenses is found in the settlement agreement, which states that "[f]rom the date Appellee moves into the home John Halisek . . . Joy Podhorsky alone and individually will be responsible" to pay all home-related expenses.  Appellants' promissory estoppel claim is without merit.

## IV.  LATENT AMBIGUITY IN SETTLEMENT AGREEMENT

A latent ambiguity in a contract exists when although the language in the contract appears to be clear on its face, other extrinsic facts create the "necessity for interpretation or a choice amongst two or more possible meanings." *Shay v Aldrich*, 487 Mich 648, 668; 790 NW2d 629 (2010) (citations and quotation marks omitted).  To determine whether a latent ambiguity exists, courts must "examine the extrinsic evidence presented and determine if in fact that evidence supports an argument that the contract language at issue . . . is susceptible to more than one interpretation." *Id*. at 668.  If ambiguity exists, courts "must examine the extrinsic evidence again to ascertain the meaning of the contract language." *Id*.

Appellants contend that the language "[f]rom the date Defendant moves" in the settlement agreement should mean from the date appellee "moved" because Stuart II only signed the settlement agreement believing appellee had already moved into the decedent's home and it was the intent of the parties that appellee would immediately be responsible for all property-related expenses.  However, based on the information in the record, appellee only ever agreed to cover property-related expenses if she actually moved into the decedent's home.  For instance, after Stuart II insisted on adding the requirement that appellant cover property-related expenses for the home to the settlement agreement, appellee's counsel replied:  "I will agree that your qualification [that appellee pay all house-related expenses personally] applies beginning the date Ms. Podhorsky takes occupancy of the decedent's home."  Further, although one of the drafts of

the settlement agreement contained the word "moved" where the word "moves" now is, appellants' counsel expressly agreed to using the word "moves" in the contract in the following letter: "While I didn't want to leave the issue open-ended, I now think my client will sign the Release if you use the original language in paragraph B(5): 'From the date Defendant moves into the home of John Halisek . . . .'"

Accordingly, despite debate amongst the parties, both agreed that the contract would read that appellee would not incur personal obligation to cover home expenses until she "moves" into the house. Thus, there is no latent ambiguity permitting an alternative interpretation.

## V. FIDUCIARY DUTIES OF A PERSONAL REPRESENTATIVE

Appellants contend that the trial court abused its discretion by refusing to remove appellee as personal representative of the Halisek estate. See *In re Duane V Baldwin Trust*, 274 Mich App 387, 396-397; 733 NW2d 419 (2007). "An abuse of discretion occurs when the court's decision falls outside the range of reasonable and principled outcomes." *Ypsilanti Charter Twp v Kircher*, 281 Mich App 251, 273; 761 NW2d 761 (2008).

MCL 700.3611 governs when a court may discharge a personal representative of an estate and provides:

(1) An interested person may petition for removal of a personal representative for cause at any time. . . .

(2) The court may remove a personal representative under any of the following circumstances:

(a) Removal is in the best interests of the estate.

(b) It is shown that the personal representative or the person who sought the personal representative's appointment intentionally misrepresented material facts in a proceeding leading to the appointment.

(c) The personal representative did any of the following:

(*i*) Disregarded a court order.

(*ii*) Became incapable of discharging the duties of office.

(*iii*) Mismanaged the estate.

(*iv*) Failed to perform a duty pertaining to the office.

Under MCL 700.3703(1), "[a] personal representative is under a duty to settle and distribute the decedent's estate in accordance with the terms of a probated and effective will and this act, and as expeditiously and efficiently as is consistent with the best interests of the estate." When distributing an estate requires the sale of property, the "personal representative may employ a qualified and disinterested appraiser to assist in ascertaining the fair market value as of

the date of the decedent's death . . . ." MCL 700.3707. Further, "if necessary for purposes of administration" a personal representative "shall take possession or control of . . . the decedent's property" and shall "take all steps reasonably necessary for the management, protection, and preservation of . . . the estate in the personal representative's possession." MCL 700.3709.

Appellee testified that shortly after the probate court issued its 2008 judgment pursuant to case evaluation, she obtained an appraisal for the decedent's home that valued the land at $82,000 as a residential property and $165,000 as a commercial property. With this information, appellee listed the home for sale with Frontier Realty located in Carson City, Michigan, at a price of around $160,000. Appellee explained that after Frontier Realty went out of business a year later, she retained Civille Realty out of Owosso to list the house at a price of $129,000. The price remained at $129,000 for two years until appellee lowered the price to $95,000 in 2012. On June 7, 2012, appellants filed a petition to discharge personal representative, assess rent, impose sanctions, and provide other appropriate relief, arguing that appellee had not put forward sufficient effort to sell the decedent's home. Thereafter, the court issued a stipulated order that required appellee to continue her efforts to sell the home and provided that if the home did not sell within 90 days, the court would schedule the matter for a status conference. When the home did not sell within 90 days, the court issued an order scheduling a bench trial for April 19, 2013, and instructing appellee to retain a new realtor and to list the house for between $49,900 and $53,000. Appellee then secured Housekeyz Realty out of Chesaning to list the home. In 2013, the house sold for a price of $45,000. When asked how she decided to alter the price during the time the house was listed, appellee responded that she "went by what the realtor said and was trying to get the best amount for everybody according to market value."

Appellee testified that, during the time the house was listed for sale, she remodeled the kitchen floor, painted every room in the house, cleaned all the carpets, kept up the yard and trees, and staged the house with furniture. Appellee further stated that she visited the home nearly every day because there was "a sump pump in the basement and it sticks sometimes or—it floods down there really bad." Appellee would also leave lights on to make the house look inhabited.

Although EPIC rules do not address whether relying on a real estate agent's opinion is reasonable for a personal representative attempting to sell real property from an estate, they do indicate that a personal representative may use the opinion of a third-party appraiser to ascertain the value of property. MCL 700.3707. Before the court's order requiring her to list the home for between $49,900 and $53,000, appellee maintained the price within the range of its appraised value. Further, EPIC does not establish a firm timeline for distribution of estate property, stating only that the personal representative must act "expeditiously and efficiently as is consistent with the best interests of the estate." MCL 700.3703(1). Because appellee listed the home within a professionally appraised value, continuously listed the home for sale, and maintained the premises, the lower court chose a reasonable and principled outcome based on the evidence before it and did not abuse its discretion in finding that appellee fulfilled her fiduciary duties.

Appellants argue that the lower court should have surcharged appellee for her failures as personal representative. Under MCL 700.3712, "[i]f the exercise or failure to exercise a power concerning the estate is improper, the personal representative is liable to interested persons for damage or loss resulting from breach of fiduciary duty . . . ." However, "[a] personal representative shall not be surcharged for acts of administration or distribution if the conduct in

-9-

question was authorized at the time." MCL 700.3703(2). Here, because appellee did not breach her fiduciary duties to the estate, the lower court did not abuse its discretion in refusing to surcharge her.

## VI. JUDICIAL DISQUALIFICATION

Appellants argue that the trial judge should have been disqualified due to bias. Stutesman's petition to disqualify the judge did not include an affidavit as required by MCR 2.003(D)(2). As this Court stated in *Kloian v Schwartz*, 272 Mich App 232, 244; 725 NW2d 671 (2006), in order to preserve a disqualification issue for appellate review, "the moving party must submit an affidavit" with the motion. Likewise, Stuart II's arguments to disqualify the judge were not adequately preserved. In order to preserve such an issue for appellate review, the moving party must file the motion for disqualification within 14 days of discovering the basis for disqualification. *Id.*; MCR 2.003(D)(1). Here, Stuart II had obvious knowledge of the judge's potential bias on February 9, 2007, when he included arguments for disqualification in his brief in support of his motion for reconsideration. On appeal, this Court declined to review Stuart II's arguments because he failed to submit the required affidavit under MCR 2.003(D)(2). *In re Stuart Estate*, unpublished opinion per curiam of the Court of Appeals, issued July 10, 2008 (Docket No. 276373), p 4. In November 2008, after remand, Stuart II again asserted arguments for disqualification, this time accompanied by an affidavit. The trial judge addressed the motion, although it seems questionable to us that Stuart II be given a "second bite at the apple," so to speak. In any event, to preserve the issue of judicial disqualification for appellate review, the moving party must, in a case such as the present one, request a referral to the chief judge following the trial judge's denial of the motion. MCR 2.003(D)(3)(a); *Welch v District Court*, 215 Mich App 253, 258; 545 NW2d 15 (1996). Here, following the trial judge's order denying Stuart II's request to transfer the case to another judge, Stuart II made no attempt to refer the decision to the chief probate judge. Accordingly, Stuart II's disqualification arguments were not properly preserved.

The disqualification arguments were not properly preserved and are not properly before this Court. At any rate, even if we were to review them, we would find no basis for appellate relief.

Affirmed.

/s/ Kirsten Frank Kelly
/s/ David H. Sawyer
/s/ Patrick M. Meter