*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ESTATE OF CALVIN BERNARD, by WALTER
BERNARD, JR., Personal Representative,

       Plaintiff-Appellant,

v

JANICE MARIE AVERS, ANCHOR BAY
PACKAGING CORPORATION, and GRANGE
INSURANCE COMPANY OF MICHIGAN,

       Defendants-Appellees.

UNPUBLISHED
April 8, 2021

No. 348048
Wayne Circuit Court
LC No. 17-005348-NI

ESTATE OF CALVIN BERNARD, by WALTER
BERNARD, JR., Personal Representative,

       Plaintiff-Appellant,

v

JANICE MARIE AVERS and ANCHOR BAY
PACKAGING CORPORATION,

       Defendants,

and

GRANGE INSURANCE COMPANY OF
MICHIGAN,

       Defendant-Appellee.

No. 348049
Wayne Circuit Court
LC No. 17-005348-NI

Before: LETICA, P.J., and GLEICHER and O'BRIEN, JJ.

PER CURIAM.

-1-

In Docket No. 348048, plaintiff, Walter Bernard, Jr., as the personal representative of the estate of Calvin Bernard,[1] appeals as of right the trial court's February 22, 2019 order of dismissal in this first-party and third-party action under the no-fault act, MCL 500.3101 *et seq*. The February 22 order granted summary disposition in favor of defendants Janice Marie Avers and Anchor Bay Packaging Corporation with respect to Calvin Bernard's (Bernard) third-party claim alleging a serious impairment of body function under MCL 500.3135(1). Plaintiff also challenges the trial court's earlier order, dated October 26, 2018, that granted summary disposition in favor of Grange Insurance Company of Michigan with respect to Bernard's first-party claim for no-fault personal protection insurance (PIP) benefits. In Docket No. 348049, plaintiff appeals as of right the trial court's February 25, 2019 order awarding Grange attorney fees and costs of $35,000. We affirm in part, reverse in part, vacate in part, and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

This case arises from a motor vehicle accident that occurred on April 20, 2016, when a vehicle driven by Bernard was rear-ended by a semitruck driven by Avers and owned by Anchor Bay. Bernard filed a claim for no-fault PIP benefits, including replacement services, with his insurer, Grange. In a letter dated October 24, 2016, Grange denied Bernard's claim. The letter stated that, following an independent medical examination by Neil A. Friedman, M.D., "the treatment rendered to date [for Bernard] has not been reasonable, necessary or related to the [accident on April 20, 2016]." On April 5, 2017, Bernard filed this action against Avers, Anchor Bay, and Grange. Count I alleged negligence against Avers, Count II alleged negligence, owner's liability, and vicarious liability against Anchor Bay, Count III alleged negligent hiring, retention, and supervision against Anchor Bay, and Count IV sought recovery of first-party PIP benefits from Grange.

Grange eventually filed a motion for summary disposition under MCR 2.116(C)(10), arguing that Bernard was not entitled to recover PIP benefits, particularly replacement services, because he had "misrepresented numerous material facts concerning his claim." Grange argued that Bernard materially misrepresented that he could not perform various household tasks, because surveillance video taken in August 2016 showed that he was able to drive, bend over, clean an appliance, and place the large appliance in his truck. Grange argued that a fraud exclusion in its no-fault policy was enforceable, and that the present case was comparable to *Bahri v IDS Prop Cas Ins Co*, 308 Mich App 420; 864 NW2d 609 (2014), because both cases involved similar fraud exclusion clauses, the plaintiff in *Bahri* had also sought benefits for replacement services, and surveillance video provided to the trial court in *Bahri* showed the plaintiff performing tasks that were inconsistent with her claimed limitations. Grange further argued that summary disposition under MCR 2.116(C)(10) was appropriate because, given the surveillance evidence, reasonable minds could not differ with respect to whether Bernard required replacement services.

---

[1] This action and the subsequent appeals were originally filed by Calvin Bernard. Sadly, Calvin Bernard passed away while these appeals were pending, and this Court allowed plaintiff to be "substituted in place of the deceased plaintiff-appellant." *Bernard v Avers*, unpublished order of the Court of Appeals, entered October 23, 2019 (Docket Nos. 348048 and 348049).

The surveillance video showed Bernard leaving his home on August 9, 2016, at approximately 4:04 a.m., driving on the highway, arriving at a gas station, filling up his truck with gas at 4:34 a.m., and getting into his car without any difficulty. At 5:26 a.m., Bernard is seen standing next to another man while the man fills a truck up with gas. Bernard could be seen standing and talking to the man at the gas pump for more than a minute and then getting into the driver's side of his truck without difficulty. At 6:47 a.m., Bernard is observed bending over and cleaning and dusting off an appliance—which appears to be a stove or some other large appliance—without difficulty, and then standing and watching the other man clean the appliance. At 6:50 a.m., Bernard and the other man together lift the large appliance into the back of the truck, and Bernard continues to clean off the appliance and move it with the assistance of the other man after it is placed on the truck.

The surveillance video also showed Bernard on August 17, 2016, walking into a gas station convenience store from 5:17 a.m. to 5:21 a.m., filling his truck up with gas, and getting into the driver's seat of the truck without difficulty. From 5:26 a.m. until 5:31 a.m., he is observed standing near his truck and engaging in activity around the truck. It appears that he may be working on the truck or loading it. From 6:35 a.m. until 7:10 a.m., the truck that Bernard is apparently driving is shown driving to different locations, where another man gets out and loads bicycles, a chair, and other items into the back of the truck.

In his response to Grange's motion for summary disposition, Bernard alleged that the surveillance video evidence was limited, "doesn't tell the whole story; and more importantly it does not reveal any misrepresentation." Bernard denied making any material misrepresentations regarding his claim for replacement services. He claimed that he sought the assistance of others to do his work, which is what the surveillance video showed, and he noted that he had not sought to recover wage-loss benefits.

In its reply brief, Grange noted that Bernard had not challenged the accuracy of the surveillance video or argued that he was not capable of performing the tasks he was depicted doing in the video. Grange also countered that while Bernard asserted that he did not personally sign the replacement services forms, his counsel submitted them to Grange on his behalf, and Bernard stated in his discovery responses that he was seeking PIP benefits for replacement services.

The trial court agreed that the evidence demonstrated that Bernard submitted fraudulent claims for replacement services and, accordingly, granted Grange's motion for summary disposition on the basis of Bernard's fraud in the submission of his claims. The court later granted Grange's motion for attorney fees and costs.

Thereafter, Avers and Anchor Bay also filed a motion for summary disposition on Bernard's third-party claims under MCR 2.116(C)(10). Avers and Anchor Bay argued that because the trial court had granted summary disposition in favor of Grange and dismissed Bernard's first-party claim with prejudice on the basis of Bernard's fraud, this rendered Bernard's no-fault policy void, meaning that Bernard did not have proper security under MCL 500.3101 at the time of the accident, and, therefore, he could not pursue a third-party action against Avers and Anchor Bay as a matter of law under MCL 500.3135(2)(c). Avers and Anchor Bay also argued that there was no genuine issue of material fact that Bernard did not suffer a serious impairment of a body function under MCL 500.3135(1).

In his response, Bernard stated that the no-fault policy was not rescinded or voided before he filed suit, and, indeed, the trial court did not void or rescind the policy. Therefore, he had proper security at the time of the accident. Bernard also contested whether the trial court had in fact made a finding that he engaged in fraud. Bernard also argued that his medical records, as well as an affidavit from his orthopedic spine surgeon, Martin Kornblum, M.D., established that he suffered serious injuries to his cervical and lumbar spine, which significantly impacted his ability to engage in basic activities, such as walking, bending, twisting, and standing.

Following a hearing, the trial court granted Avers and Anchor Bay's motion for summary disposition after concluding that Bernard's contract with Grange had been rescinded on the basis of Bernard's fraud, and dismissed Bernard's third-party claims with prejudice.

## II. SUMMARY DISPOSITION

In Docket No. 348048, plaintiff challenges the trial court's grants of summary disposition to Grange, Avers, and Anchor Bay. This Court reviews de novo a trial court's decision on a motion for summary disposition. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). The trial court granted defendants' motions for summary disposition under MCR 2.116(C)(10). In *El-Khalil*, our Supreme Court explained:

> A motion under MCR 2.116(C)(10) . . . tests the factual sufficiency of a claim. *Johnson v VanderKooi*, 502 Mich 751, 761; 918 NW2d 785 (2018). When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion. *Id*. A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact. *Lowrey v LMPS & LMPJ, Inc*, 500 Mich 1, 5; 890 NW2d 344 (2016). "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Johnson*, 502 Mich at 761 (quotation marks, citation, and brackets omitted in original). [*El-Khalil*, 504 Mich at 160.]

## A. FRAUD

Plaintiff first challenges the trial court's decision granting Grange's motion for summary disposition under MCR 2.116(C)(10) on the basis of Bernard's fraud in the submission of his claim for no-fault benefits. We find no error.

## 1. WAIVER OR ESTOPPEL REGARDING FRAUD DEFENSE

Preliminarily, plaintiff argues that Grange waived, or is estopped from raising, the defense of fraud because it did not cite fraud as a reason for denying Bernard's claim for PIP benefits in its initial denial letter, dated October 24, 2016.[2] We disagree.

---

[2] Though plaintiff did not properly preserve this issue in the trial court, we nevertheless exercise our discretion to address it because it is an issue of law and the record contains all of the necessary

The general rule is that once an insurer "has denied coverage to its insured and stated its defenses, the insurer has waived or is estopped from raising new defenses." *Mich Twp Participating Plan v Fed Ins Co*, 233 Mich App 422, 436; 592 NW2d 760 (1999). However, our Supreme Court has recognized that "[w]aiver and estoppel are founded upon knowledge of facts," and a defense asserted before litigation cannot be said to be waived until the insurer has knowledge of the relevant facts regarding the defense. *Martinek v Fireman's Ins Co*, 247 Mich 188, 191; 225 NW 527 (1929).

The record reflects that when Grange first denied Bernard's claim for no-fault benefits on October 24, 2016, the allegedly fraudulent replacement services documentation had not yet been discovered. According to Grange's claims manager, Irene Armesto, at the time Bernard's claim was initially denied, Grange was not yet aware that Bernard may have engaged in fraud with respect to the submission of his replacement services calendars. Plaintiff has not presented contrary evidence suggesting that Grange had in fact discovered that fraud had taken place at the time the denial letter was transmitted. Additionally, it was after Bernard made inaccurate representations in his discovery responses, as well as during his deposition, which occurred after the initial denial letter, that Grange became further aware of Bernard's fraud. Therefore, Bernard's argument that Grange waived, or was estopped from raising, the defense of fraud is not persuasive.

2. FRAUD IN THE SUBMISSION OF PLAINTIFF'S CLAIM FOR NO-FAULT BENEFITS

Plaintiff further argues that even if Grange was not estopped from raising fraud as a defense, the trial court nevertheless erred by granting summary disposition in favor of Grange on the basis of Bernard's fraud in the submission of his claims for PIP benefits. We disagree.

Bernard's no-fault policy with Grange contains an antifraud provision that states:

**2. Concealment, Misrepresentation Or Fraud**

This coverage form is void in any case of fraud by "you" at any time as it relates to this coverage form. It is also void if "you" or any other "insured," at any time, *intentionally conceal or misrepresent a material fact concerning*:

a. This coverage form;

b. The covered "auto";

c. "Your" interest in the covered "auto"; or

d. A claim under this coverage form. [Emphasis added.]

In *Bahri*, 308 Mich App at 422, the plaintiff submitted a claim for PIP and uninsured motorist benefits, and she claimed that she required replacement services. The documentation that

facts. See *Jawad A Shah, MD, PC v State Farm Mut Auto Ins Co*, 324 Mich App 182, 192-193; 920 NW2d 148 (2018).

she provided to the insurance company stated that she received household replacement services from October 2011 until February 2012. *Id*. However, the defendant insurer conducted surveillance and captured video of the plaintiff engaging in activities inconsistent with her claimed replacement services, such as bending, lifting, driving, and running errands. *Id*. After the plaintiff filed suit seeking PIP and uninsured motorist benefits from the defendant, the defendant moved for summary disposition, arguing that the plaintiff was not entitled to recover no-fault benefits because of her fraudulent misrepresentations. The no-fault policy at issue included a fraud exclusion clause that stated, "We do not provide coverage for any insured who has made fraudulent statements or engaged in fraudulent conduct in connection with any accident or loss for which coverage is sought under this policy." *Id.* at 423-424 (quotation marks omitted).

This Court agreed with the trial court that summary disposition was appropriate because the plaintiff had submitted replacement documentation reflecting that she received services from October 1, 2011 until February 29, 2012, and the subject accident did not even occur until October 29, 2011. *Id*. at 425. This Court also explained how the surveillance evidence established that the plaintiff's documentation concerning replacement services confirmed that she made fraudulent misrepresentations for the purpose of obtaining PIP benefits:

> Moreover, defendant produced surveillance evidence depicting plaintiff performing activities inconsistent with her claimed limitations. Plaintiff was observed bending, lifting, carrying objects, running errands, and driving-on the dates when she specifically claimed she needed help with such tasks. Of particular note, on November 11, 2011, plaintiff represented that she required assistance vacuuming, cooking, dishwashing, making beds, grocery shopping, taking out the garbage, driving, and running errands. Yet surveillance videos captured her performing various activities, such as lifting, carrying, and dumping a large bucket of liquid in her yard. On December 19, 2011, plaintiff sought replacement services for various household activities, including grocery shopping. But on that day, she was observed running several errands from 11:05 a.m. until 7:00 p.m. Plaintiff indicated that on December 29, 2011, she required [the individual providing replacement services] assistance to drive her and perform multiple household activities. However, surveillance video on that day captured plaintiff driving her own vehicle on errands. Similar discrepancies were noted for December 30, 2011. [*Id*. at 425-426.]

This Court held that there was no genuine issue of material fact regarding the plaintiff's fraud, and the surveillance evidence specifically contradicted representations made in the replacement services documentation. *Id*. at 426.[3]

---

[3] Our Supreme Court recently held that a fraud-exclusion provision in a no-fault insurance policy that voided the policy in the event of a fraudulent claim (similar to the fraud-exclusion policy at issue in this case) was invalid and unenforceable as applied to mandatory no-fault benefits because it was "grounded on neither the no-fault act nor the common law." *Meemic Ins Co v Fortson*, 506

Mich 287, 293; 954 NW2d 115 (2020). The *Meemic* Court, however, specifically noted *Bahri* and left its holding untouched. The Court stated:

> The Court of Appeals has upheld a fraud-exclusion provision when the fraud related to proof of loss on a claim rather than fraud in the procurement or execution of the policy. See *Bahri v IDS Prop Cas Ins Co*, 308 Mich App 420, 425; 864 NW2d 609 (2014); but see [*Shelton v Auto-Owners Ins Co*, 318 Mich App 648, 652-655; 899 NW2d 744 (2017)] (limiting *Bahri* to when the claimant is an insured under the defendant's policy). A leading treatise has explained that "to avoid a policy on the ground of fraud or false swearing in the proof of loss, the statement in question must be material." 13A Couch, Insurance, 3d (2019 rev ed), § 197:18, pp 48-49. In this case, however, because there is no allegation of fraud in relation to [the claim beneficiary's] claim for benefits, the Court need not address the issue of whether and to what extent fraud related to proof of loss can justify voiding the policy. Moreover, because this case involves fraud by someone other than the claim beneficiary, the Court need not address whether a clause voiding a policy for postprocurement fraud would be valid as applied to fraud by an individual who is both a policyholder and the claim beneficiary. [*Meemic*, 506 Mich at 307 n 15 (slip op at 16 n 15).]

Because the *Meemic* Court specifically declined to overrule or otherwise abrogate *Bahri*'s holding, the case still remains good law. As a published opinion, we are bound to follow *Bahri* under the rule of stare decisis. MCR 7.215(C)(2).

We acknowledge that the dissent believes this case should be controlled by *Williams v Farm Bureau Mut Ins Co*, ___ Mich App ___; ___ NW2d ___ (2021) (Docket No. 349903), because this Court in that case held that *Meemic* concluded that "antifraud provisions are invalid to the degree they purport to apply to" postprocurement fraud. Yet *Meemic* itself states that it should not be read "to suggest that a contractual provision that rescinds a contract because of postprocurement fraud is invalid in all circumstances." *Meemic*, 506 Mich at 307. The dissent ardently avoids this clear and unequivocal pronouncement from *Meemic*, and suggests that, by reading this portion of *Meemic* to mean what it says, this opinion fails to follow "the letter" of *Meemic*. *Meemic*, however, explicitly states that antifraud provisions are not invalid as applied to postprocurement fraud in all circumstances, and we are "bound by stare decisis to follow the decisions of the Supreme Court." *Charles A Murray Trust v Futrell*, 303 Mich App 28, 48; 840 NW2d 775 (2013). The dissent further contends that our conclusion requires declaring a conflict panel, but it does not as this Court need not convene a conflict panel to follow a Supreme Court decision, even if a decision of this Court conflicts with the Supreme Court's decision. *Id*. at 49.

Further, as already explained, *Meemic* explicitly recognized *Bahri* and declined to overrule or otherwise abrogate its holding. Similarly, a special panel of this Court has not overruled or abrogated *Bahri*'s holding. Therefore, we are bound to follow *Bahri*'s holding under MCR 7.215(J)(1). To conclude otherwise would mean that *Williams* overruled *Bahri*, which it clearly could not do. See MCR 7.215(J)(1). The dissent asserts that this Court can choose to not follow *Bahri* because *Meemic* "undermined a portion of *Bahri*'s holding," and that "a fair reading of *Meemic* leads to the inescapable conclusion that when it comes to postprocurement fraud, *Bahri*'s

The fraud-exclusion provision in Grange's policy provides that coverage is void if an insured intentionally conceals or misrepresents a material fact regarding a claim. The *Bahri* Court explained:

> To void a policy because the insured has wilfully misrepresented a material fact, an insurer must show that (1) the misrepresentation was material, (2) that it was false, (3) that the insured knew that it was false at the time it was made or that it was made recklessly, without any knowledge of its truth, and (4) that the insured made the material misrepresentation with the intention that the insurer would act upon it. A statement is material if it is reasonably relevant to the insurer's investigation of a claim. [*Id*. at 657.]

In support of his claim for replacement services, Bernard submitted calendars for the months of May through December 2016, all signed by his then girlfriend, Stephanie Bridgeforth. The replacement services calendar for the month of August 2016 indicated that Bridgeforth performed replacement services such as cooking, cleaning the kitchen, vacuuming, dusting, buying groceries, running errands, taking out the garbage, doing laundry, changing linens, and driving. The replacement services calendar indicates that on August 9, 2016, Bridgeforth performed services for Bernard such as cooking, cleaning the kitchen, and dusting. On August 17, 2016, Bridgeforth vacuumed, cleaned, dusted, cooked, and made beds for Bernard. The day before, on August 16, 2016, Bridgeforth cleaned the kitchen, cooked, and ran errands for Bernard.

However, Grange produced surveillance evidence confirming that on August 9, 2016, and August 17, 2016, Bernard was driving his truck for lengthy periods of time as part of his work collecting scrap metal, getting in and out of the vehicle without difficulty, putting gas in the truck, cleaning and dusting off a large appliance, and then putting the appliance into his truck and moving it around while in the truck bed with the assistance of another man. Like the plaintiff in *Bahri*, Bernard submitted the replacement services calendars to support his claim for replacement services, but the surveillance evidence, which showed him engaging in an active lifestyle as he went about his work, belied his claim that he required replacement services. Like in *Bahri*, "[r]easonable minds could not differ in light of this clear evidence that plaintiff made fraudulent representations for purposes of recovering PIP benefits." *Bahri*, 308 Mich App at 426. Additionally, there was no genuine issue of material fact about whether Bernard intentionally concealed a material fact when he submitted documentation in support of his alleged need for replacement services but was aware that he did not require such services because he was able to go about his daily work activities, including cleaning and lifting a large appliance as depicted in

---

foundation is precedentially rotten." Yet "a fair reading" of *Meemic* shows that our Supreme Court explicitly acknowledged *Bahri*'s holding and distinguished it. Only a tortured reading of *Meemic* can support the conclusion that, by explicitly acknowledging *Bahri*'s holding and distinguishing it, *Meemic* intended to abrogate or otherwise overrule that holding.

the surveillance video. Therefore, the record evidence confirmed that Bernard suppressed the truth with the intent of defrauding Grange.[4]

In *Candler v Farm Bureau Mut Ins Co of Mich*, 321 Mich App 772; 910 NW2d 666 (2017), this Court considered whether the plaintiff committed a fraudulent insurance act as contemplated by MCL 500.3173a(2). The plaintiff submitted replacement services calendars to the Michigan Automobile Insurance Placement Facility, which were allegedly signed by his brother and indicated that his brother had provided services. *Id*. at 775. However, evidence produced during discovery confirmed that the plaintiff's brother had not provided replacement services during the relevant time period, and the plaintiff's counsel conceded at a motion hearing that the signatures on the documentation were forged. *Id*. at 776. This Court determined that the plaintiff knew that the replacement calendars contained false information, not only because of his counsel's concession, but because the plaintiff had moved to another city to live with his girlfriend, who then provided replacement services. *Id*. at 781. This Court thus concluded that no reasonable juror could conclude that the plaintiff was not aware he was submitting false information material to his claim for no-fault benefits. *Id*. at 782. While the elements of a fraudulent insurance act are not the same as the elements of a fraudulent misrepresentation, what is significant about *Candler* is this Court's recognition that a reasonable juror could not conclude that the plaintiff was unaware that he was submitting false information about his brother providing replacement services, because the plaintiff had moved to another city. Similarly, in the present case, Bernard submitted proof of his claim for replacement services he alleged he needed, such as cooking, cleaning, dusting, and running errands, and a reasonable juror could not conclude that Bernard did not know this information was false, given that Bernard was aware that he was actively conducting the necessary activities for his work without any difficulty.

## B. RESCISSION OF THE NO-FAULT POLICY

Plaintiff next argues that any fraud by Bernard did not operate to render his no-fault policy with Grange void *ab initio*, and therefore, he had proper security under MCL 500.3101 at the time of the accident. We conclude that the policy was rescinded, but that Bernard nonetheless had proper security at the time of the accident for purposes of the relevant statutes.

Our Supreme Court recently decided *Meemic Ins Co v Fortson*, 506 Mich 287; 954 NW2d 115 (2020), wherein it explained that when statutorily-mandated no-fault benefits are at issue, a postprocurement fraud clause that rescinds a no-fault insurance policy is generally only "valid as applied to a party's failure to perform a substantial part of the contract or one of its essential terms," so "the mere breach of a contract would not entitle the injured party to" rescind the contract. *Id*. at 307-308. The *Meemic* Court explained that rescission is generally only a remedy for fraud

---

[4] Bernard contends that, based on this Court's decision in *Haydaw v Farm Bureau Ins Co*, ___ Mich App ___; ___ NW2d ___ (2020) (Docket No. 345516), reversal is required because Grange relies "squarely" on statements made during discovery "as the basis for invoking the fraud provision of Grange's policy and seeking dismissal of his case." This is untrue, however, because Grange invoked the fraud-exclusion provision in its contract with Bernard based on fraudulent statements made *before* litigation began—namely Bernard's representations about needing replacement services in the forms that he submitted to Grange.

"related to the inducement to or inception of the contract." *Id.* at 305. Yet the Court explicitly recognized that, in *Bahri*, this Court "upheld a fraud-exclusion provision when the fraud related to proof of loss on a claim rather than fraud in the procurement or execution of the policy." *Id.* at 307 n 15, citing *Bahri*, 308 Mich App at 425. The *Meemic* Court declined, however, to overrule or otherwise address whether *Bahri* was properly decided, stating:

> A leading treatise has explained that "to avoid a policy on the ground of fraud or false swearing in the proof of loss, the statement in question must be material." 13A Couch, Insurance, 3d (2019 rev ed), § 197:18, pp 48-49. In this case, however, because there is no allegation of fraud in relation to [the claim beneficiary's] claim for benefits, the Court need not address the issue of whether and to what extent fraud related to proof of loss can justify voiding the policy. Moreover, because this case involves fraud by someone other than the claim beneficiary, the Court need not address whether a clause voiding a policy for postprocurement fraud would be valid as applied to fraud by an individual who is both a policyholder and the claim beneficiary. [*Meemic*, 506 Mich at 307 n 15.]

Thus, even in light of *Meemic*, *Bahri* remains good law, so Grange could rescind its contract with Bernard based on the fraud-exclusion provision in their contract "when the fraud related to proof of loss," *id.*, as it did in this case.

The question, therefore, is not whether rescission was available to Grange, but whether Bernard's contract with Grange was actually rescinded. Plaintiff contends that it was not because the trial court never explicitly stated that the contract was rescinded. This argument is unconvincing. Grange moved for summary disposition based a contractual defense—the fraud-exclusion provision in its contract with Bernard—and the trial court granted the motion. Again, the fraud-exclusion provision in the contract provided:

> This coverage form is *void* in any case of fraud by "you" at any time as it relates to this coverage form. It is also *void* if "you" or any other "insured," at any time, intentionally conceal or misrepresent a material fact concerning:
>
> a. This coverage form;
>
> b. The covered "auto";
>
> c. "Your" interest in the covered "auto"; or
>
> d. A claim under this coverage form. [Emphasis added.]

In *Meemic*, our Supreme Court recognized that it is not uncommon for courts to interpret "a contractual provision allowing a party to 'void' a contract as providing for rescission," and as such, "[i]t seems to us an unremarkable proposition that an insurer may seek to rescind a policy that is voidable on the basis of fraud." *Id.* at 506 n 21.

Bernard's policy with Grange provided only that it would be "void" in the event of fraud; it did not state that a claim would be denied for fraud. Thus, plaintiff's contention that Grange merely denied Bernard's claim is unconvincing; Grange moved for summary disposition based on

the fraud-exclusion provision in the contract, and that argument prevailed. Based on the language of the fraud-exclusion provision, the policy was rendered void. That is, Grange rescinded the contract.

Plaintiff seems to contend that, by prevailing, Grange merely rendered the contract "voidable," not void, and therefore the contract was not rescinded. A "voidable contract" is "[a] contract that is valid, but which may be legally voided at the option of one of the parties . . . One which can be avoided (cancelled) by one party because a right of rescission exists as a result of some defect or illegality (e.g., fraud or incompetence)." *Epps v 4 Quarters Restoration LLC*, 498 Mich 518, 538; 872 NW2d 412 (2015) (quotation marks and citation omitted; alterations in original). Clearly, the policy here is not still "valid" because Grange was relieved of its duty to pay no-fault benefits to Bernard under the policy. Thus, the policy was not "voidable," but void.

Plaintiff further argues that "[a]t most, Defendant Grange cancelled the policy issued to Mr. Bernard," but this argument is also unavailing. Grange sought to avoid paying—and the trial court ruled that Grange was not liable to pay—no-fault benefits that had vested under Bernard's policy with Grange, and "cancellation applies only prospectively and thus leaves in place all claims that vested before the cancellation." *Meemic*, 506 Mich at 312. Thus, the policy could not have been cancelled, but was indeed rescinded.

Plaintiff finally argues that the policy could not have been rescinded because Grange never returned the premiums paid by Bernard. While plaintiff is correct in that premiums are to be refunded when an insurance policy is rescinded, see *Burton v Wolverine Mut Ins Co*, 213 Mich App 514, 520; 540 NW2d 480 (1995), plaintiff has not provided any support for his apparent assertion that a policy is not rescinded *until* the premiums are refunded. In other words, that Bernard's premiums were not refunded, even if true, has no bearing on the determination of whether Bernard's policy with Grange was rescinded.

Despite that Bernard's policy with Grange was rescinded, we conclude that the trial court erred by dismissing plaintiff's claim on grounds that Bernard did not have proper security for purposes of MCL 500.3135(2)(c). That statute provides in relevant part:

> (1) A person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement.

> (2) For a cause of action for damages pursuant to subsection (1) filed on or after July 26, 1996, all of the following apply:

> * * *

> (c) Damages shall not be assessed in favor of a party who was operating his or her own vehicle at the time the injury occurred and did not have in effect for that

-11-

motor vehicle the security required by [MCL 500.3101] at the time the injury occurred.[5]

MCL 500.3101 in turn provides in relevant part:

> (1) The owner or registrant of a motor vehicle required to be registered in this state shall maintain security for payment of benefits under personal protection insurance, property protection insurance, and residual liability insurance. Security is only required to be in effect during the period the motor vehicle is driven or moved on a highway.[6]

The basis of plaintiff's recovery against Avers and Anchor Bay is statutory, not contractual; it is based on MCL 500.3135, not Bernard's contract with Grange.[7] Bernard's policy with Grange is only relevant because plaintiff's recovery depends on whether the policy was "in effect . . . at the time" Bernard was injured. MCL 500.3135(2)(c). Thus, Avers and Anchor Bay could only avoid liability if the trial court's rescission of Bernard's contract with Grange rendered the contract not in effect at the time Bernard was injured for purposes of MCL 500.3132(2)(c), thereby barring plaintiff's recovery.

As a factual matter, it is uncontested that, *at the time that Bernard was injured*, he was maintaining proper security for his motor vehicle by virtue of his policy with Grange. Despite this fact, the trial court concluded that Bernard did not have proper security because his policy with Grange was rescinded. It is true that rescission, as a contractual remedy, works to "undo [a contract] from the beginning," *Wall v Zynda*, 283 Mich 260, 264; 278 NW 66 (1938) (quotation marks and citation omitted), so "it is as if no contract had been made," *Bazzi v Sentinel Ins Co*, 502 Mich 390, 409 n 10; 919 NW2d 20 (2018). But this contractual remedy is a "legal fiction," *Esurance Prop & Cas Ins Co v Michigan Assigned Claims Plan*, 330 Mich App 584, 593; 950 NW2d 528 (2019), the fiction being that courts pretend the contract never existed between the relevant parties, see, e.g., *Bazzi*, 502 Mich at 412 (holding that even though an insurance contract was rescinded between the insurer and the entity that took out the insurance, the same contract may not have been rescinded between the insurer and a third-party beneficiary of the insurance contract). The legal fiction is intended as a contractual remedy, and it does not actually alter the past.

The issue here is whether Bernard, in fact, had proper security in effect at the time of his injury. The uncontested reality is that he did in the form of his insurance policy with Grange. The subsequent rescission of that policy as a contractual remedy for Bernard's fraud does not alter the reality that, at the time of Bernard's injury, he indeed had an insurance policy with Grange.

---

[5] This statute was amended by 2019 PA 22, effective June 11, 2019, but the amendment is not relevant to this appeal.

[6] This statute was amended by 2019 PA 22, effective June 11, 2019, but the amendment is not relevant to this appeal.

[7] Because plaintiff's recovery is statutory, a contractual remedy like rescission does not, by itself, offer Avers and Anchor Bay relief.

Accordingly, because Bernard had the policy with Grange at the time of the accident and that policy constituted proper security for purposes of MCL 500.3101(1), we conclude that the bar to recovery in MCL 500.3135(2)(c) does not apply in this case.

## C. SERIOUS IMPAIRMENT OF A BODY FUNCTION

Avers and Anchor Bay argue that even if Bernard had proper security under MCL 500.3101(1) and was therefore not barred from recovery under MCL 500.3135(2)(c), they were nevertheless entitled to summary disposition because there was no genuine issue of material fact whether Bernard suffered a serious impairment of a body function under MCL 500.3135(1). We disagree.

### 1. APPLICABLE LAW

When the trial court decided Avers and Anchor Bay's motion for summary disposition, MCL 500.3135 provided, in pertinent part:

> (1) A person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement.

> * * *

> (5) As used in this section, "serious impairment of body function" means an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life.[8]

In *McCormick v Carrier*, 487 Mich 180, 195; 795 NW2d 517 (2010), the Michigan Supreme Court construed the language in MCL 500.3135(5),[9] and held that the statute "provides three prongs that are necessary to establish a 'serious impairment of body function': (1) an objectively manifested impairment (2) of an important body function that (3) affects the person's general ability to lead his or her normal life." The Court stated that this analysis is "inherently

---

[8] *McCormick v Carrier*, 487 Mich 180, 195; 795 NW2d 517 (2010), is the leading case governing the interpretation of MCL 500.3135(5), which was recently amended by 2019 PA 22, effective June 11, 2019. In amending the statute, the Legislature substantially revised MCL 500.3135(5) "to expressly incorporate *McCormick*'s interpretation of all three components of [the statutory definition of "serious impairment of a body function]." *Lingenfelter v Farm Bureau Gen Ins Co*, 505 Mich 1063, 1063 n 1; 943 NW2d 87 (2020) (CAVANAGH, J., dissenting.) Because the amendment took effect after the trial court rendered its decision in this case, *McCormick*, rather than the current version of MCL 500.3135(5), is the controlling authority. See *Lingenfelter*, 505 Mich at 1063 n 1 (CAVANAGH, J., dissenting.)

[9] At the time *McCormick* was decided, MCL 500.3135(5) was codified as MCL 500.3135(7). As a result of legislative amendments in 2012, see 2012 PA 158, MCL 500.3135(7) was renumbered to MCL 500.3135(5), but the substance of the statutory text remained the same.

fact- and circumstance-specific," and the analysis must be conducted case-by-case. *Id*. at 215. If there are no factual disputes regarding the nature and extent of an individual's injuries, whether the individual has suffered a serious impairment of a body function is for the court to decide as a matter of law. MCL 500.3135(2)(a)(*i*); *McCormick*, 487 Mich at 192-193, 215.

For the first prong, the Court, after reviewing dictionary definitions, explained how an objectively manifested impairment should be defined:

> Overall, these [dictionary] definitions suggest that the common meaning of "objectively manifested" in MCL 500.3135(7) is an impairment that is evidenced by actual symptoms or conditions that someone other than the injured person would observe or perceive as impairing a body function. *In other words, an "objectively manifested" impairment is commonly understood as one observable or perceivable from actual symptoms or conditions*. [*McCormick*, 487 Mich at 196 (emphasis supplied).]

The Court went on to explain that the pivotal inquiry for this prong is whether the impairment, as opposed to the injury or its symptoms, is objectively manifested. *Id*. at 197.

Addressing the second prong—whether the impaired body function is "important"—the Court explained that it will depend on the specific circumstances involved. The Court provided the following guidance:

> Whether a body function has great "value," "significance," or "consequence" will vary depending on the person. Therefore, this prong is an inherently subjective inquiry that must be decided on a case-by-case basis, because what may seem to be a trivial body function for most people may be subjectively important to some, depending on the relationship of that function to the person's life. [*Id.* at 199.]

The third and final prong is whether the impairment of a body function "affects the person's general ability to lead his or her normal life." MCL 500.3135(5); *McCormick*, 487 Mich at 200. The Court offered the following guidance for courts undertaking an analysis of this third prong:

> Therefore, the plain text of the statute and these [dictionary] definitions demonstrate that the common understanding of to "affect the person's ability to lead his or her normal life" is to have an influence on some of the person's capacity to live in his or her normal manner of living. By modifying "normal life" with "his or her," the Legislature indicated that this requires a subjective, person- and fact-specific inquiry that must be decided on a case-by-case basis. Determining the effect or influence that the impairment has had on a plaintiff's ability to lead a normal life necessarily requires a comparison of the plaintiff's life before and after the incident. [*McCormick*, 487 Mich at 202.]

The *McCormick* Court cautioned that a person's general ability to lead his or her normal life need not be destroyed, only *affected*. *Id*.

## 2. APPLICATION OF MCL 500.3135

In this case, the submitted evidence demonstrates that there are significant factual disputes regarding the nature and extent of Bernard's injuries, and the disputes are material to whether Bernard suffered a serious impairment of a body function. Therefore, this is not an appropriate case for a court to decide the issue of serious impairment of a body function as a matter of law. MCL 500.3135(2)(a)(*ii*). Specifically, Bernard's orthopedic spine surgeon, Dr. Kornblum, testified that he observed "abnormal pathology" in Bernard in the nature of a "C5-C6 disc herniation with impingement and C6-C7 displacement," and that Bernard also had a "L4-L5 disc herniation and an accompanying anterolisthesis at that level." Dr. Kornblum opined that these "severe and ongoing injuries" to Bernard's cervical and lumbar spine were sustained in the "April 20, 2016, motor vehicle crash sequence" and that he required medical treatment for those injuries, including the anterior cervical discectomy and fusion surgery that Dr. Kornblum performed. On the other hand, Grange's independent medical examiner, Dr. Friedman, after reviewing Bernard's medical records, including X-rays and MRIs, stated that his "clinical examination fail[ed] to reveal objective evidence of significant orthopedic or neurological pathology affecting the spine and extremities," and "[t]here is no objective evidence of functional impairment or disability." Dr. Friedman also opined that "[t]here is no evidence [Bernard] suffered any specific auto-related injury," and that multiple imaging studies were negative, "except for some degenerative changes involving the cervical and lumbar spine." Dr. Friedman also noted that an MRI study of Bernard's knee, which showed "a small joint effusion, as well as cartilage tears" could not specifically be attributed to the April 20, 2016 accident.

Moreover, another independent medical examiner, Todd Francis, M.D., also reviewed Bernard's medical records and concluded that, following the accident, Bernard suffered a cervical and lumbar strain, but that films taken at the time of the accident did not show "any sign of trauma or fracture." Dr. Francis further opined that Bernard's MRIs of his lumbar and cervical spine showed "degenerative disease at C5-6[,]" no impingement of cords or nerves that Dr. Francis could discern, and degenerative, rather than traumatic issues with the L4-L5 discs, "with a disc herniation and protrusion." Both Dr. Francis and Dr. Friedman expressed concern that Bernard sought medical care on the basis of his attorney's recommendation. Dr. Francis opined that the degenerative issues in Bernard's cervical spine or lumbar spine did not result from the motor vehicle. Thus, there are significant factual disputes regarding Bernard's injuries.

Moreover, with regard to the first prong of the analysis in *McCormick*, 487 Mich at 196, Bernard presented evidence that he suffered from an objectively manifested impairment of a body function, because he testified in his deposition that he had undergone fusion surgery in January 2017, and had experienced pain in his neck, chest, and back that prevented him from lifting objects over 20 pounds and from bending over. Bernard also experienced numbness in his legs, as well as swelling in his feet and legs. Bernard did not have a full range of motion in his neck and he experienced pain in his low back. Bernard also had pain and cramping in his hands. Dr. Kornblum also stated that Bernard was experiencing "spinal pain and numbness" that radiated into his hands, and that he incurred "abnormal pathology" in the manner of a C5-C6 disc herniation with cord impingement, and C6-C7 displacement. Bernard also had "L4-L5 disc herniation and an accompanying anterolisthesis at that level."

Regarding the second prong set forth in *McCormick*, Bernard presented evidence to demonstrate that the objectively manifested impairment related to an important body function, because his abilities to stand for lengthy periods, lift, walk, and bend over were impacted, all of which were necessary to conduct his work of collecting scrap metal, and which undermined his ability to conduct his snow removal business. Finally, Bernard presented evidence that his ability to lead his normal life was affected. He testified that before the accident he was able to play basketball, bowl, and lift heavy items over 20 pounds at work. After the accident, however, he could only drive his work truck, he could not lift more than 20 pounds, he could not run his snow removal business, he had trouble using the stairs, he had issues in the bedroom, and he could not do housework.

Avers and Anchor Bay rely on an affidavit submitted by Avers, who averred that immediately following the accident, she observed Bernard immediately getting out of his vehicle, checking the damage to his vehicle, and walking and bending without any issues. Avers and Anchor Bay also submitted the surveillance photographs of Bernard during his work day on August 9, 2016, in which he is observed standing, putting gas in his car, bending over, and helping another man clean and lift an appliance into his truck. However, Bernard presented other evidence, in particular his deposition testimony and Dr. Kornblum's affidavit, that, viewed in the light most favorable to Bernard, establishes factual disputes with regard to whether he suffered a serious impairment of a body function. Notwithstanding the surveillance evidence, which we agree seriously undermines Bernard's case, questions regarding the weight and credibility of Bernard's evidence, weighed against the surveillance evidence, should be resolved by the trier of fact. See *Innovative Adult Foster Care, Inc v Ragin*, 285 Mich App 466, 480; 776 NW2d 398 (2009) ("It is well settled that the circuit court may not weigh the evidence or make determinations of credibility when deciding a motion for summary disposition.") Therefore, we conclude that Avers and Anchor Bay were not entitled to summary disposition because there exist genuine issues of material fact whether Bernard suffered a serious impairment of a body function.

III. ATTORNEY FEES

In Docket No. 348049, plaintiff challenges the trial court's award of $32,344.50 in attorney fees to Grange. We conclude that it is necessary to vacate this award and remand for further proceedings with respect to this issue.

A. STANDARD OF REVIEW

This Court reviews a trial court's award of attorney fees for an abuse of discretion. *Pirgu v United Servs Auto Ass'n*, 499 Mich 269, 274; 884 NW2d 257 (2016). The trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Id.*

B. APPLICABLE LAW

Grange sought attorney fees under both the no-fault act, MCL 500.3148, and the court rule governing case evaluation sanctions, MCR 2.403. The trial court did not state whether it was

awarding attorney fees under the statute or the court rule. At the time the trial court decided Grange's motion, MCL 500.3148(2)[10] provided:

> An insurer may be allowed by a court an award of a reasonable sum against a claimant as an attorney's fee for the insurer's attorney in defense against a claim that was in some respect fraudulent or so excessive as to have no reasonable foundation.

MCR 2.403[11] provided, in pertinent part:

### (O) Rejecting Party's Liability for Costs.

(1) If a party has rejected an evaluation and the action proceeds to verdict, that party must pay the opposing party's *actual costs* unless the verdict is more favorable to the rejecting party than the case evaluation. However, if the opposing party has also rejected the evaluation, a party is entitled to costs only if the verdict is more favorable to that party than the case evaluation.

(2) For the purpose of this rule "verdict" includes,

* * *

(c) a judgment entered as a result of a ruling on a motion after rejection of the case evaluation.

* * *

(6) *For the purpose of this rule, actual costs are*

* * *

(b) *a reasonable attorney fee based on a reasonable hourly or daily rate as determined by the trial judge for services necessitated by the rejection of the case evaluation*, which may include legal services provided by attorneys representing themselves or the entity for whom they work, including the time and labor of any legal assistant as defined by MCR 2.626. [Emphasis added.]

In *Pirgu*, 499 Mich at 271, our Supreme Court held that the legal framework for determining reasonable attorney fees set forth in *Smith v Khouri*, 481 Mich 519; 751 NW2d 472

---

[10] MCL 500.3148 was amended by 2019 PA 21, effective June 11, 2019. The amendment is not relevant to this appeal.

[11] MCR 2.403 was subsequently amended, effective May 1, 2019. The amendment is not relevant to this appeal.

(2008), also applies to an award of attorney fees under MCL 500.3148(1). The Court in *Pirgu* explained the initial inquiry a trial court should make when determining reasonable attorney fees:

> [A] trial court must begin its reasonableness analysis "by determining the fee customarily charged in the locality for similar legal services" and then multiplying that number "by the reasonable number of hours expended in the case." After a trial court has calculated this baseline figure, it must consider and briefly discuss on the record the remaining *Wood*[12] factors and the factors in MRPC 1.5(a) to determine whether any up or down adjustments from the base number are appropriate. [*Pirgu*, 499 Mich at 276, quoting *Smith*, 481 Mich at 530-531 (opinion by TAYLOR, C.J.).]

To assist trial courts in their analysis, the Court in *Pirgu* refined the legal framework from the duplicative lists of factors in *Wood* and *Smith* as follows:

> (1) the experience, reputation, and ability of the lawyer or lawyers performing the services,
>
> (2) the difficulty of the case, i.e., the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly,
>
> (3) the amount in question and the results obtained,
>
> (4) the expenses incurred,
>
> (5) the nature and length of the professional relationship with the client,
>
> (6) the likelihood, if apparent to the client, that acceptance of the particular employment will preclude other employment by the lawyer,
>
> (7) the time limitations imposed by the client or by the circumstances, and
>
> (8) whether the fee is fixed or contingent. [*Pirgu*, 499 Mich at 282.]

This list of factors is not exclusive. *Id*. To allow for meaningful appellate review, the trial court "should briefly discuss its view of each of the factors above on the record and justify the relevance and use of any additional factors." *Id*. If the opposing party challenges the request for attorney fees, "[t]he trial court should normally hold an evidentiary hearing." *Head v Phillips Camper Sales & Rental, Inc*, 234 Mich App 94, 113; 593 NW2d 595 (1999). However, if the parties establish a sufficient record and the trial court fully explains its reasoning, an evidentiary hearing may not be required. *Id*.

---

[12] *Wood v Detroit Auto-Inter Ins Exch*, 413 Mich 573; 321 NW2d 653 (1982).

## C. APPLICATION

After determining a reasonable attorney and paralegal fee, the trial court calculated its attorney fee award by multiplying that amount by the reasonable number of hours expended in the case, and plaintiff does not challenge this baseline calculation. *Pirgu*, 499 Mich at 276. The trial court did not, however, specify whether it was awarding fees under MCR 2.403(O) or MCL 500.3148(2). See MCR 2.403(O)(6)(b) (stating that actual costs include a reasonable attorney fee "*for services necessitated by the rejection of the case evaluation*.") (Emphasis added.); MCL 500.3148(2) (providing for attorney fees as "a reasonable sum . . . for the insurer's attorney in defense against a claim."). Moreover, the trial court failed to consider the remaining factors set forth in *Wood* and MRPC 1.5(a) to determine whether an upward or downward adjustment to its baseline calculation was necessary. *Pirgu*, 499 Mich at 276. By failing to explain its view of the remaining factors, the court "necessarily abused its discretion" and remand is necessary. *Id*. at 283; *Powers v Brown*, 328 Mich App 617, 624-625; 939 NW2d 733 (2019).

On remand, the trial court should first state the authority under which it is awarding attorney fees—MCR 2.403(O) or MCL 500.3148(2). The court already calculated a baseline figure by multiplying a reasonable hourly rate for both attorneys and paralegals by a reasonable amount of time expended on the case, *Pirgu*, 499 Mich at 281, and plaintiff does not challenge this calculation. However, the court should consider the other factors enumerated in *Pirgu*. *Powers*, 328 Mich App at 625, citing *Pirgu*, 499 Mich at 281-282. "Specifically, the trial court shall briefly discuss its view of each of the factors on the record and justify the relevance and use of any additional factors." *Powers*, 328 Mich App at 625, citing *Pirgu*, 499 Mich at 282.

## D. SHOULD THE AMOUNT THAT GRANGE ACTUALLY PAID IN ATTORNEY FEES BE CONSIDERED ON REMAND?

The parties dispute whether the trial court should have considered—and on remand, whether the it should consider—the attorney fees actually paid by Grange.

In *McAuley v Gen Motors Corp*, 457 Mich 513, 515; 578 NW2d 282 (1998), our Supreme Court considered whether a prevailing party could recover an attorney fee award under MCR 2.403(O) after already being compensated a reasonable attorney fee under a statutory provision. The Court held that the plaintiff could not recover "duplicative attorney fees under [MCR 2.403] after he had already been fully reimbursed for his reasonable attorney fees in connection with his claim against the [defendant]." *McAuley*, 457 Mich at 519. The Court recognized that the statutory provision allowing for the recovery of attorney fees, as well as MCR 2.403(O), "were intended to relieve prevailing parties or plaintiffs of the reasonable costs of all or part of the litigation." *McAuley*, 457 Mich at 519. However, the statute and court rule were not intended to allow attorney fees to be imposed as a penalty, or for a party to recover in excess of a reasonable attorney fee determined by the trial court. *Id*. The Court further explained that damages in Michigan are intended to be compensatory only and how this legal principle impacted the recovery of attorney fees:

> It is well established that generally only compensatory damages are available in Michigan and that punitive sanctions may not be imposed. Because the purpose of compensatory damages is to make the injured party whole for the

losses actually suffered, the amount of recovery for such damages is inherently limited by the amount of the loss; the party may not make a profit or obtain more than one recovery. [*McAuley*, 457 Mich at 520 (citations omitted).]

Subsequently, in *Rafferty v Markovitz*, 461 Mich 265, 266; 602 NW2d 367 (1999), the Supreme Court considered whether a trial court erred by awarding the plaintiff attorney fees under both the Civil Rights Act (CRA), MCL 37.2101 *et seq.*, and MCR 2.403(O). Because the plaintiff had been awarded reasonable attorney fees under the CRA, the Court held that she did not have any "actual cost[s]" to recover under the court rule. *Rafferty*, 461 Mich at 272. The Court reaffirmed its reasoning in *McAuley* that Michigan favors only compensatory damages, and punitive sanctions are not permissible. *Id.* at 270-271. The Court explained, "Because the purpose of compensatory damages is to make an injured party whole for losses actually suffered, the amount of recovery for such damages is thus limited by the amount of the loss." *Id.* at 271.

Grange cites this Court's decision in *Cleary v Turning Point*, 203 Mich App 208, 211-212; 512 NW2d 9 (1993), in which the plaintiff argued that the trial court abused its discretion by awarding attorney fees under MCR 2.403(O)(1) that were based on an hourly rate that was higher than the rate that defense counsel actually charged. This Court rejected the plaintiff's argument, holding that the court rule did not require the trial court to determine that reasonable attorney fees were equivalent to actual attorney fees charged. *Cleary*, 203 Mich App at 212. Following this Court's decision in *Cleary*, however, MCR 2.403(O)(6)(b) was amended to state that actual costs include "a reasonable attorney fee based on a reasonable hourly or daily rate *as determined by the trial judge*[.]" (Emphasis added.)

In our view, this case is distinguishable from *Cleary*, because plaintiff here is not simply challenging the reasonableness of the hourly rate that the trial court utilized in calculating attorney fees, but whether Grange may have incurred a profit or windfall that is not intended by the compensatory goal of damages in Michigan. Moreover, since *Cleary*, the Michigan Supreme Court decided *McAuley* and *Rafferty*, both of which reinforce that the goal of an attorney fee award is to relieve prevailing parties of the reasonable costs of litigation, and that an attorney fee award must be compensatory, intended to make the recouping party whole, and not amount to a penalty or allow the recouping party to recover a profit. *Rafferty*, 461 Mich at 270-271; *McAuley*, 457 Mich at 519-520. Therefore, Grange's reliance on *Cleary* is unavailing, and we ultimately agree with plaintiff that, based on *Rafferty* and *McAuley*, Grange's recovery of attorney fees may not exceed what it actually paid. Therefore, on remand, the trial court should consider what Grange actually paid for its attorney fees.[13]

---

[13] In a single line, Grange asserts that what it paid in attorney fees is protected by attorney-client privilege. However, Grange failed to cite any caselaw or otherwise brief this argument, so we consider the argument abandoned. See *Mitcham v City of Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959) ("Failure to brief a question on appeal is tantamount to abandoning it.").

## VI. CONCLUSION

In sum, we affirm the trial court's October 26, 2018 order granting summary disposition in favor of Grange, but reverse the February 22, 2019 order granting summary disposition in favor of Avers and Anchor Bay, vacate the February 25, 2019 order awarding costs and attorney fees to Grange, and remand this case to the trial court for proceedings consistent with this opinion.

Affirmed in part, reversed in part, vacated in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Anica Letica
/s/ Colleen A. O'Brien